**Mr. and Mrs. Larry E. GRIDLEY, Plaintiffs-Appellants,**

**v.**

**Morris JOHNSON et al., Defendants-Respondents.**

**No. 55563.**

Supreme Court of Missouri, Division No. 1.

Jan. 10, 1972.

Motions for Rehearing or to Transfer to Court En Banc Denied Feb. 22, 1972.

Elwyn L. Cady, Jr., Independence, for appellants.

William H. Woodson, of Spencer, Fane, Britt & Browne, Kansas City, for appellees Johnson, Doane and Botwin.

Clem W. Fairchild, of Linde, Thomson, Van Dyke, Fairchild & Langworthy, Kansas City, for appellee Baptist Memorial Hospital.

SEILER, Judge.

The plaintiffs, husband and wife, sued three doctors and a hospital for damages caused the wife by the failure of the defendants to make a pregnancy test before doing a dilatation and curettage (referred to by the doctors as a "D and C") and a gall bladder operation on her, when, in fact, she was pregnant and delivered a child seven months later. The court dismissed the hospital before the trial, dismissed defendant Doane at the close of the evidence, and the jury returned a verdict in favor of the other two doctors, Johnson and Botwin.

The plaintiffs appeal,[1] claiming various trial errors, which the defendants dispute,

1. We have jurisdiction because of the amount involved.

as well as claiming plaintiffs did not make a submissible case.

■ We first overrule the latter contention. Here, as in MacDonald v. Metropolitan St. Ry. Co., 219 Mo. 468, 118 S.W. 78, 81, " . . . The testimony is ladened with a luxuriant medical terminology quite useless for the administration of justice . . . " And here, as in that case, we will content ourselves " . . . with shortly giving the tendency of it in everyday speech". Proceeding accordingly, there was competent evidence from which the jury could find that the medical profession in the Kansas City area does not perform the operations here involved on a woman of child bearing age who has symptoms consistent with pregnancy without first determining whether she is pregnant; that this admittedly was not done in this case, and although the patient did not miscarry and the fetus was not injured by the surgery, the health of plaintiff wife was impaired and she suffered mental anguish concerning possible injury to the unborn child.

■ Plaintiffs raise the point that the court erred in overruling their objection to argument by defendants' counsel about the inference the jury should draw from the failure of plaintiffs to produce as witnesses two doctors Mrs. Gridley saw a year and a half or so after the surgery.

The matter arose this way: In Mrs. Gridley's direct examination, the only doctors she mentioned were Drs. Johnson, Doane and Botwin, all in connection with the surgery, and Dr. Buckner, who delivered the baby. She testified she still had soreness in her stomach, was not able to keep up her housework, and unable to accept outside employment. On her cross-examination, defendants brought out that in July 1967, on the recommendation of Dr. Buckner, because she was not feeling well and had diarrhea, she went to a Dr. Hoadley. Then, in August 1967, the Gridleys moved to Jefferson City, where they resided two years, and in Jefferson City she saw a Dr. Strait. Mrs. Gridley testified this was in the emergency ward, that he was an intern, she saw him one time, and was not to go back. It does not appear in the record what her complaint was to Dr. Strait or what he did. Then the Gridleys moved to Atlanta, Georgia, where she had a polyp removed and a D and C, which she testified was the same thing Dr. Johnson was supposed to have done.

On re-direct, she testified that while she was living in Grandview she took various preparations purchased at a health store, "for ulcers, which Dr. Hoadley said I had".

Plaintiffs' counsel, in opening argument, devoted most of his time to the liability issue, saying little about damages and making no mention of Drs. Hoadley and Strait.

Defendants' counsel spent most of his argument on lack of proof of injury and damage to Mrs. Gridley. About a third of the way through his argument, counsel said: "Furthermore, regarding this damage, the fact that Mrs. Gridley has only been to doctors three or four times in the years since . . . is strong indication . . . this lady hasn't suffered any damage. After Dr. Botwin's treatment she saw Dr. Hoadley for a little while for some diarrhea . . . there is no evidence . . . diarrhea . . . had anything to do with the surgery . . . Some year after that, she saw a doctor down in Jefferson City . . . one time, found an ulcer . . . [T]here is no evidence . . . an ulcer some two years later is in any way whatsoever related to this case. *If there had been a doctor that would say these things, don't you really believe that doctor would have been brought in here by these people to tell you this?*" (emphasis supplied). At this point, plaintiffs' counsel objected. The objection was overruled.

Defendants' counsel continued: "Gentlemen, what isn't in evidence maybe is as important as what was evidence in some respects about these damages. *It's the law*

*of the State of Missouri that if plaintiff fails to call a doctor who has taken care of her and who has been her attending doctor, at the time of a lawsuit, the jury is entitled to infer by his absence, gentlemen, that his testimony would be contrary to her position"* (emphasis supplied).

Plaintiffs' counsel again objected. This time the court sustained the objection, but declined to instruct the jury to disregard the argument.[2] Defendants' counsel then immediately said as follows: *"Gentlemen, if these doctors would have supported plaintiffs, isn't it reasonable to think they would have been here and testified?"* (emphasis supplied). Plaintiffs' counsel again objected. The objection was overruled.

We believe it is clear from the above that defendants were permitted to argue to the jury the fact plaintiffs did not produce Dr. Hoadley and Dr. Strait meant the two doctors would not have supported the plaintiffs and the jury should so regard it. Was this proper under the circumstances of this case? We rule it was not.

Under State ex rel. McNutt v. Keet, (Mo.Sup. banc), 432 S.W.2d 597, in a damage suit, once issue has been joined on the question of damages, plaintiff will be taken to have waived the patient-physician privilege so far as discovery is concerned. Once the privilege is thus waived, defendant can proceed, for example, to take the deposition of plaintiff's attending doctor or those doctors who have information bearing on the claims plaintiff is asserting against defendant.

Does this waiver mean that plaintiff's doctors are equally available so that defendant cannot comment on plaintiff's failure to produce her doctor? Our answer is that the McNutt case, supra, does not stand for the proposition that all the doctors are thereby equally available. The fact that a doctor under McNutt is sub-

ject to a deposition where he would not have been before McNutt, does not necessarily mean that he is equally available. Many witnesses all along have been subject to having their depositions taken, but they are nevertheless not equally available. A spouse, for example, would be subject to deposition; so would an employee or a subordinate, so would a relative, but it does not follow that their being subject to a deposition means that if they are available and not produced as witnesses, the opposing party may comment on the non-production. There is more involved here than simply being subject to deposition.

On this point, the reasoning set forth in Chavaries v. National Life & Accident Ins. Co. of Tennessee, (Mo.App.) 110 S.W.2d 790, 794, is still sound, the court saying as follows: "Now the term 'available,' in the sense in which we are using it, does not mean merely available or accessible for the service of a subpoena, since any witness who can be found may be subpoenaed at the instance of either party to a cause. To the contrary, the question of whether a witness is 'available' to one or the other of the contending parties depends upon such matters as the one party's superior means of knowledge of the existence and identity of the witness, the nature of the testimony that the witness would be expected to give in the light of his previous statements or declarations, if any, about the facts of the case, and the relationship borne by the witness to a particular party as the same would reasonably be expected to affect his personal interest in the outcome of the litigation, and make it natural that he would be expected to testify in favor of the one party and against the other. In other words, a witness may be said to have been peculiarly 'available' to one party to an action, so that upon that party's failure to have produced him in court an inference will arise that his testimony would have been unfavorable, when, because of such

2. The court's reason was, "I told them that in Instruction 1." Instruction 1 was MAI 2.01. We see nothing in it which could be considered the equivalent of an instruction to disregard the argument to which the objection had just been sustained.

party's opportunity for knowledge of or control over the witness, or the community of interest between the two, or the prior statements and declarations of the witness, it would be reasonably proper that the witness would have been called to the trial to testify for such party except for the fact that it was either known or feared that his testimony on the stand would have been damaging rather than favorable . . . "

However, while the McNutt case, supra, as stated, does not permit plaintiffs to assail defendants' argument on the basis that the two doctors—Hoadley and Strait—were equally available and hence their absence did not permit the inference argued by defendants, it does not follow that because the two doctors were not equally available the defendants were entitled to make the argument they did. The difficulty is that there is nothing in the record to show that Drs. Hoadley and Strait had any knowledge about the claims which defendants say they should have been brought in to support. There is nothing to show that either had any knowledge or opinion relating to the question of whether there should have been a pregnancy test given Mrs. Gridley prior to surgery. We do not believe it is reasonable to say that where a patient makes a malpractice claim, all doctors plaintiff sees thereafter must, ipso facto, be produced as witnesses or else the defendant can argue the inference is the missing doctors would not have supported the claim of malpractice.

Likewise, there is nothing in the record to show either Dr. Hoadley or Dr. Strait had any knowledge or opinion relating to the question of whether Mrs. Gridley suffered any damage by reason of the surgery performed by the defendants. The fact that she went to Dr. Hoadley and Dr. Strait was first brought out by defendants on cross-examination. She said she went to Dr. Hoadley on the recommendation of Dr. Buckner, because she was not feeling well and had diarrhea. There is no proof

what Dr. Hoadley did for her and no assertion that her complaints to Dr. Hoadley, whatever they were, were claimed to be connected with defendants' alleged malpractice. No claim to that effect was made by plaintiffs' counsel in argument. On re-direct, plaintiff said Dr. Hoadley told her she had ulcers, but there is nothing in the record indicating a claim by plaintiffs that her ulcers were the result of the malpractice.

As to Dr. Strait, there is no evidence as to why Mrs. Gridley went to him or what he did. If, as Mrs. Gridley testified, he was simply an intern, whom she saw in the emergency ward one time and was not to return, it does not seem likely he could throw any light on the case one way or the other.

In State v. Denmon (Mo.Sup.) 473 S.W. 2d 741, decided November 8, 1971, this court had occasion to consider the equally available rule and when it applies. In that case, the defendant, a prisoner in the state penitentiary, was arguing that a guard, an employee of the state, was not equally available to him and that he (the prisoner) was therefore entitled to the inference that the failure of the state to call the guard as a witness in his prosecution for offering violence to a prison officer meant the testimony of the guard would be unfavorable to the state. The court ruled it was true the guard was not equally available (just as here Dr. Hoadley and Dr. Strait were not equally available to defendants), but nevertheless the inference could not be drawn, because there was no evidence in the case that the guard was in a position or location where he could have seen any part of the fight which took place between defendant and another guard. The court ruled the state was not under obligation to bring the witness in to testify that he did not see or hear anything, and overruled defendant's claim of error, saying " . . . there was no testimony to show that [the guard] had any knowledge about the oc-

currence concerning which defendant says he should be brought in to testify." [3]

The same is true here, and for this reason the court erred in permitting the argument. The argument was a powerful one, effectively presented, and we believe it requires reversal of the judgment and remand for a new trial.

To aid the trial court and the parties, we deem it appropriate to discuss certain issues raised in the briefs which are certain to reappear in the next trial. Plaintiffs contend the trial court was in error in not permitting plaintiffs' counsel to cross examine one of defendants' expert medical witnesses from a medical textbook. One of the main issues in the case was whether defendants should have ruled out the possibility that Mrs. Gridley was pregnant before they submitted her to surgery. Defendants insisted there was nothing to give them any inkling that Mrs. Gridley might be pregnant and that there was no call to give her any pregnancy tests, despite the fact she was married, only 36 years old, and had had two children.[4]

Dr. Weller, a young specialist in obstetrics and gynecology, testified for defendants. He was of the opinion that what Dr. Johnson did was good medical practice, that Dr. Johnson took an adequate case history and did an adequate physical examination of Mrs. Gridley. He testified further that Dr. Johnson couldn't really tell when Mrs. Gridley's period was and was sure Dr. Johnson would not have proceeded if there was "any substantiation at all" there was a pregnancy. He staunchly defended Dr. Johnson's not making any pregnancy test.

Counsel then attempted to cross-examine Dr. Weller from a text entitled "Pitfalls in Gynecologic Diagnosis and Surgery", written by two professors of medicine who were on the staff of the Cook County Hospital and Cook County Graduate School of Medicine, published by a well known medical textbook publisher. Dr. Weller said he was not familiar with the book or the authors, although he knew the reputation of Cook County General Hospital and knew the publisher.

Counsel for plaintiffs then proposed to ask Dr. Weller whether he agreed or disagreed with the following passage from the textbook: "Amenorrhea [5] of any duration in a postpuberal patient must be investigated by bimanual and rectovaginal examination and laboratory tests to rule out pregnancy." Defendants' counsel objected to the question on several grounds, among them that the witness was not acquainted with the book and did not recog-

3. The cost of litigation is already high these days. It would increase trial expense even more if a party would have to produce, as trial witnesses, doctors he has been to for ailments not connected with the lawsuit, to avoid an otherwise unfavorable inference.

4. Defendants' evidence was that the history given Dr. Johnson by Mrs. Gridley as to the time of her last period was uncertain and there was no indication menstruation had ceased.
Mrs. Gridley's testimony was that she informed Dr. Johnson her last period had been October 2 (this was 47 days before she first consulted him), that she also told him her periods had always been regular, and that the only time the vaginal bleeding of which she was complaining occurred was at times of marital intercourse (she had been married to Mr. Gridley about eight months when she went to Dr. Johnson).
Dr. Botwin performed the gall bladder surgery five days after Dr. Johnson performed the D and C. Dr. Botwin's preoperative notes show that Mrs. Gridley had had abdominal pain and nausea for the past month.
Mrs. Gridley testified she returned to Dr. Botwin after the surgery because of a small blood clot which had formed on her stomach. This was about two weeks after the operation. Her stomach was getting larger and her breasts were enlarging. She asked if she could possibly be pregnant and he told her this was physically impossible after what she had been through.

5. Amenorrhea means absence of menstruation, Blakiston's New Gould Medical Dictionary (2nd Ed., 1956).

nize it as authoritative. The court sustained the objection. If the court did so on the basis of the grounds just stated, it should not have.

■ Under Missouri law it is proper to cross-examine a medical expert by framing a proposition in the exact language of the author and asking the witness whether he agrees to it, MacDonald v. Metropolitan St. Ry. Co., supra, 118 S.W. 1. c. 86. Before propounding such a question it is not necessary to ascertain whether the witness agrees with the author, Cooper v. Atchison, T. & S. F. R. Co., 347 Mo. 555, 148 S.W.2d 773, 780. Text books on technical subjects may be used in cross examination of an expert witness by reading therefrom and inquiring whether the witness agrees, Hemminghaus v. Ferguson, 358 Mo. 476, 215 S.W.2d 481, 489; Whitley v. Stein (Mo.App.) 34 S.W.2d 998, 1001.

We reject the proposition that the expert witness being cross-examined must first agree that the text is standard or authoritative. The practical effect of such cross-examination would be to give the witness complete control of the cross-examination. He need only say that he is not acquainted with the book or its author to prevent its use in testing his qualifications, no matter how eminent or accepted the author may be. The fewer books and authorities the witness knows about or will acknowledge and the less knowledge he has of what has been written in the field, the more difficult it will be to cross-examine him along this line. It gives him full veto power over the cross-examiner's efforts.

As we say, it is not necessary that the witness concede the text is standard or authoritative, although if the witness does so this is sufficient foundation to use the book in cross-examination. The party desiring to the use of the books can also establish their standing by proper voir dire examination of his own expert outside the hearing of the jury, thereby laying the foundation for their use in cross-examina-

tion at the proper time. There are many standard texts used by practitioners to keep abreast of proper and modern techniques in diagnosis and treatment. We need not fear that such texts are untrustworthy. As Wigmore points out, Evidence (3rd Ed.), Vol. VI, Sec. 1692, p. 6, such books are not written from a bias in favor of a lawsuit or an individual or by one who is paid a fee to testify; they are written primarily for the writer's profession, and his reputation depends on the correctness of his data and validity of his conclusions, all of which he realizes will be subject to careful professional analysis.

■ Inasmuch as the case is being remanded, it also is appropriate to deal with plaintiffs' request of the trial court to instruct that "negligence" meant failure to use that degree of skill and learning ordinarily used under the same or similar circumstances "by the members of defendant's profession." Instead, the court used MAI 11.06, which refers to that degree of skill and learning ordinarily used under the same or similar circumstances "by the members of defendant's profession in good standing practicing in similar localities." We agree with plaintiff that the words "in good standing" are ambiguous, indefinite, and may even be misleading. For example, if a doctor were negligent it would make no difference that he or his brethren were properly licensed or were in good repute with their fellow practitioners or stood high in the community, yet the jury might get the idea that if defendant was "in good standing", it would constitute a defense. It will frequently, perhaps generally, be true that a defendant in a malpractice case is properly licensed and stands well with his colleagues and in the community. On the other hand, there might be a defendant who is not a member of a recognized medical society and the phrase could be quite harmful to him. Either way, the words "in good standing" are not essential to proper submission of the issue in a medical malpractice case and should not be used on retrial in this or in future cases.

With regard to "practicing in similar localities", the modern trend unquestionably is away from basing the standard of care on the matter of localities. See, Louisell and Williams, Medical Malpractice, Vol. 1, Sec. 8.06. As early as 1916, the Minnesota Supreme Court, in Viita v. Fleming, 132 Minn. 128, 155 N.W. 1077, 1081, said: " . . . But in these days the physician or surgeon in a village like Cloquet is not hampered by lack of opportunity for advancement. Frequent meetings of medical societies, articles in the medical journals, books by acknowledged authorities, and extensive experience in hospital work put the country doctor on more equal terms with his city brother. He would probably resent an imputation that he possessed less skill than the average physician or surgeon in the large cities, and we are unwilling to hold that he is to be judged only by the qualifications that others in the same village or similar villages possess . . ."

The annotation in 8 A.L.R.2d 772, 773, on the analogous matter of the competency of a physician from one community to testify as to the standard of care required of a defendant practicing in another community points out that at an earlier time the theory was " . . . a doctor in a small community or village, not having the same opportunity and resources for keeping abreast of the advances in his profession, should not be held to the same standard of care and skill as that employed by physicians and surgeons in large cities. But the reason for the earlier rule largely disappeared with the advent of present-day rapid methods of transportation and easy means of communication . . . [T]here is now no lack of opportunity for the physician or surgeon to keep abreast of the advances made in his profession and to be familiar with the latest methods and practices adopted . . . so that . . . the controlling factor in determining the expert's competency to testify . . . is, aside from his basic educational and professional training, his practical knowledge of what is usually and customarily done by other practitioners under circumstances similar to those which confronted the defendant . . . "

As stated in 82 Harv.L.R.1781–82, " . . . The ready availability to all practitioners of medical journals, sales, representatives from drug manufacturers, postgraduate courses, and other forms of continuing education now assures that many recent advances can be incorporated in every physician's treatments. The existence of national specialty boards and specialty publications means that nationwide standards are in fact emerging for the medical specialties . . . In fact, general practice has itself recently been designated as a speciality . . . "

In connection with nationwide standards, we note the Missouri legislature has authorized our state board of registration for the healing arts to accept the certification of the National Board of Medical Examiners of the United States, in lieu of giving its own professional examination for licensure, Sec. 334.031, RSMo 1969, V.A. M.S. It is interesting and pertinent to observe that of the six doctors who testified in this case, only one took his combined medical training and internship in Kansas City. The others ranged from Harvard Medical School in the east to Utah in the west, with their residencies in widely separated cities. There is less and less justification for dual medical standards—one for modern medicine and another for not so modern, depending on locality. When the reason for the rule vanishes, so should the rule.

A recent case reviewing a number of decisions dealing with the "locality" rule is Brune v. Belinkoff, 354 Mass. 102, 235 N.E. 2d 793, 798. The court concluded: " . . . The time has come when the medical profession should no longer be Balkanized by the application of varying geographic standards in malpractice cases . . .

"The proper standard is whether the physician, if a general practitioner, has exercised the degree of care and skill of the average qualified practitioner, taking into

account the advances of the profession. In applying this standard it is permissible to consider the medical resources available to the physician as *one* circumstance in determining the skill and care required. Under this standard some allowance is thus made for the type of community in which the physician carries on his practice. . . ."

"One holding himself out as a specialist should be held to the standard of care and skill of the average member of the profession practising the specialty, taking into account the advances in the profession. And, as in the case of the general practitioner, it is permissible to consider the medical resources available to him."

So far as retrial of the case at bar is concerned, the question is largely academic, because the setting is the large metropolitan area of Kansas City and the occasion will not arise for attempting to scale defendants' duties to a standard where the practice may not be so up to date. However, we believe the subject is one to which this court's committee on jury instructions should address itself at an early date. In the meantime, MAI 11.06 should continue to be used, with the deletion of the words "in good standing", as earlier set forth.

■ We affirm the action of the trial court in dismissing defendant Doane at the close of the evidence. Plaintiffs were attempting to hold Doane for the alleged wrongful acts and omissions of Dr. Johnson on the theory they were partners in the operation of Grandview Clinic. All the record shows is that the two men were practicing medicine at the same clinic in Grandview, Missouri, a suburb of Kansas City. Letterheads and billheads had "Grandview Clinic" and the address at top center, with the names of the two men to the side. It does not appear what sort of legal entity Grandview Clinic is, who owns it, or the building housing it. It was not shown whether there was any partnership agreement or partnership income tax return. Dr. Johnson was ill at time of trial and unable to appear. The only person

who testified as to any of the business arrangements was Dr. Doane. According to him, the two men were not partners. Each man saw and charged his own patients, except that if one were absent the other would see the patient and receive the charge. Neither shared in the fees of the other. The arrangement was that Johnson would share the expenses of the office and equipment; that when money was received on a patient handled by Johnson, it was credited to his account and then every three months, after Johnson's proportion of the office expense was taken out (if averaged around 42% of Johnson's collections), the balance was distributed to Dr. Johnson. Doane described himself as a sort of fiscal agent for Johnson.

Some of the foregoing is consistent with a partnership, but it is not sufficient to establish a partnership. The evidence falls short of showing the two men intended to or did operate as a partnership in the practice of medicine. Sec. 358.060, RSMo 1969, V.A.M.S.

■ As stated at the outset, the trial court sustained defendant hospital's motion to dismiss directed to plaintiffs' petition. The motion to dismiss was on two grounds: (1) failure to state a claim and (2) charitable immunity. Before the motion was ruled on, plaintiffs asked in event it were not overruled, that they be permitted to amend to make a more definite statement of the duty and breach thereof of the defendant hospital and that the disposition of the charitable immunity point await an opportunity to make discovery of the full facts of the financial operation of the hospital. The court, however, overruled the motion, without more.

The petition alleged that "defendant hospital held itself out as a community health center in Greater Kansas City, fully equipped for laboratory and other diagnostic testing, particularly for the testing of patients preoperatively to prevent the usage of hospital operative facilities for . . . contraindicated major surgery." It went

on to allege that whereas Mrs. Gridley was in fact pregnant, the defendants failed to use the proper diagnostic aids available to determine this fact and as a result of the improper diagnosis and treatment, Mrs. Gridley suffered pain and scarring, along with fear for the safety of her child and other damages.

We cannot say the petition was so defective that the court should have sustained the motion to dismiss without giving plaintiffs an opportunity to plead further, although in justice to the trial court, it should be pointed out that at the time of the ruling the doctrine of charitable immunity was still in force in Missouri and it was not in dispute that the defendant hospital was a corporation organized under Ch. 352 of the 1949 Revised Statutes pertaining to religious and charitable associations. Now, of course, we know that in Abernathy v. Sisters of St. Mary's (Mo.Sup. banc) 446 S.W.2d 599, the doctrine of charitable immunity was abolished, starting with that case. However, ". . . it is recognized that a plaintiff, prior to the effective date of the new rule . . . had a right to present evidence that a defendant, in fact, was not entitled to claim the immunity provided by the doctrine itself. The stated purpose of an organization is not the sole factor for consideration . . . ", Clark v. Faith Hospital Association (Mo.Sup.), 472 S.W.2d 375, decided November 8, 1971. Plaintiffs here have been deprived of any opportunity to present such evidence.

Additionally, if the motion to dismiss was sustained on the ground of failure to state a claim, plaintiffs, under the circumstances, are entitled to an opportunity to amend their petition. "Ordinarily when a first pleading is ruled to be insufficient in a trial court, the party is afforded a reasonable time to file an amended pleading if desired . . . " Dietrich v. Pulitzer Publishing Co. (Mo.Sup.) 422 S.W.2d 330, 334. See also, Civil Rules 55.53 and 67.05, V.A.M.R.; Cady v. Hartford Acc. & Indemn. Co. (Mo.Sup.) 439 S.W.2d 483;

Thompson v. Fiber-Lum, Inc. (Mo.App.) 464 S.W.2d 514.

The petition alleges the hospital held itself out as a "community health center". It is not clear what all this encompasses, but, as said in Bing v. Thunig, 2 N.Y.2d 656, 163 N.Y.S.2d 3, 11, 143 N.E.2d 3, 8: "Present-day hospitals, as their manner of operation plainly demonstrates, do far more than furnish facilities for treatment . . " In 14 ALR 3rd 873, 875, it is said: "This task of defining the nature of hospital liability to a patient in connection with his care and treatment will undoubtedly be complicated by the fact that the operations and characteristics of hospitals (and of modern health care generally) have undergone widespread changes over the last few decades, and that most of the rules stated by the courts in the few decisions upon the matter have been drawn with respect to the hospitals and medical practice of another era." Later in the same annotation it is said, 14 ALR 3rd 878: "Whatever may have been the case in earlier times, it seems clear that as organized health care has developed, the hospital, as such, takes an increasingly active part in supplying and regulating the purely medical care which the patient receives . . . Every doctor using the hospital facilities is ordinarily required to comply with its standards and subject his work to staff consultation, review, and regulation, at pain of losing his staff privileges, a loss which may quite effectively curtail his ability to practice his profession. And every doctor working in a hospital must to a large extent depend upon its laboratory and other technical facilities . . . in order to effectively carry out his function."

▪ The fact the defendant doctors here were not employees of the defendant hospital does not necessarily mean the hospital cannot be held for adverse effects of treatment or surgery approved by the doctors, Darling v. Charleston Community Memorial Hospital, 33 Ill.2d 326, 211 N.E. 2d 253, cert. den. 383 U.S. 946, 86 S.Ct. 1204, 16 L.Ed.2d 209.

The petition alleges the hospital was equipped to perform diagnostic testing pre-operatively to prevent the usage of its facilities for contraindicated surgery. It also alleges the defendants failed to use proper diagnostic techniques on Mrs. Gridley, and, as a consequence, she underwent surgery when she should not have done so, all in violation of the professional duties of the defendants. We do not know what particulars plaintiffs may be able to allege and prove to connect the alleged failure to use available diagnostic procedures with violation of duties owed plaintiffs. It is apparent from the record, however, that modern hospitals do operate under definite rules and regulations and subject themselves to recognized accreditation standards.

The judgment is affirmed as to defendant Doane. It is reversed and remanded as to defendants Johnson, Botwin and Baptist Memorial Hospital for further proceedings consistent herewith.

All of the Judges concur.