James A. ALEXANDER, Appellant,

v.

Dwayne L. BERGMANN, M.D., Respondent.

No. 46231.

Missouri Court of Appeals, Eastern District, Division Three.

Jan. 24, 1984.

Motion For Rehearing and/or Transfer to Supreme Court Denied March 8, 1984.

Application to Transfer Denied April 16, 1984.

Robert T. Ebert, Clayton, for appellant.

Joseph H. Mueller, St. Louis, for respondent.

REINHARD, Judge.

Plaintiff appeals from a judgment entered on a jury verdict for defendant in his medical malpractice action. We reverse and remand for a new trial.

Plaintiff attended the University of Arkansas on a football scholarship and received his M.B.A. degree from Harvard University. He worked at Kroger Company for several years and in 1975 commenced work for Constantino Brokerage Company. At the time of trial in 1982, he was president of the company.

In June of 1976, plaintiff, age 33, underwent a company physical and felt in excellent physical condition. On the evening of July 4, 1976, after a day spent working in his yard, plaintiff felt a pain in his groin. After several hours the pain intensified and plaintiff went to a hospital emergency room for treatment. He was given medication to relieve the pain and was told to see a urologist. On July 9, defendant, a urologist, first examined plaintiff and diagnosed his condition as a severe urinary tract infection for which he was treated with antibiotics. After additional tests and diagnostic procedures, defendant determined that plaintiff's bladder was not draining completely, thus allowing an infection to develop. Defendant diagnosed plaintiff's condition as a median bar blockage of the bladder.

Defendant testified that there were two surgical procedures to correct the problem; a transurethral resection and "Y–V plasty" surgery (incision in the bladder neck muscle). In October, 1976, defendant performed a "Y–V plasty" surgery upon plaintiff. This left him sterile, a condition which is a natural result of that operation.

Complications developed after the "Y–V plasty" surgery and over the next year defendant operated on plaintiff five more

times. He performed a meatotomy (surgical splitting of the end of the penis), and performed a first stage urethroplasty. This entailed splitting the penis from the end to the testicles, cutting the skin and urethra, sewing the skin back and cutting a hole above the testicles to allow him to urinate. The open skin was allowed to heal for six months. During this period, plaintiff was in extreme discomfort and had to wear a sanitary napkin at all times. After six months, a second stage urethroplasty was performed. In this operation, the skin was sewn back and a new tube was formed from which he could urinate. The incision above the testicles was closed.

After this last operation, plaintiff continued to experience severe pain in his scrotum. It was a much different pain than that for which he had originally seen defendant. In October, 1977, plaintiff terminated his relationship with defendant and consulted Dr. Michael Chehval. He recommended that plaintiff see Dr. William Fair, Chairman of the Department of Urology at Washington University School of Medicine.

Dr. Fair examined plaintiff and was unable to determine a urological cause for his pain. Dr. Fair referred him to Dr. Leonard Fabian and Dr. Chunduri, both anesthesiologists, to determine whether plaintiff's pain was psychogenic or organic in nature. In March, 1979 and August, 1980, respectively, Dr. Fabian and Dr. Chunduri separately performed modified differential spinal blocks on plaintiff. Both doctors concluded that to a reasonable degree of medical certainty, plaintiff's pain was organic in nature and not psychogenic.

In 1980, Dr. Fair made arrangements for plaintiff to enter the Johns Hopkins Pain Treatment Center in Baltimore, Maryland. Plaintiff testified that his treatment at Johns Hopkins was a conservative treatment in which patients were taught to accept the fact that they might live the rest of their life in pain. Treatment consisted of psychiatric counseling, as well as the use of biofeedback machines. Plaintiff further testified that as a result of the treatment at Johns Hopkins, he had learned to block out the pain during the day at work, but otherwise he was in constant pain. Dr. Fair testified that one way to eliminate the pain was to perform a nerve block which would likely leave plaintiff permanently impotent.

Plaintiff filed this action in 1980. In his petition, plaintiff alleged *inter alia* that defendant negligently diagnosed his bladder condition and failed to inform him that "Y–V plasty" surgery would leave him sterile. Dr. Fair testified as an expert witness for plaintiff. He testified that the original operation, the "Y–V plasty" surgery is "virtually a discredited operation" and it was not medically proper to perform it upon a young man such as plaintiff. Dr. Fair further testified there was no proper indication for doing the initial "Y–V plasty" surgery. He also testified that he did not know the urological cause of plaintiff's pain, but to a reasonable degree of medical certainty plaintiff's problems all stemmed from the first surgery. That is:

It's a cascade effect.... The first surgery is what required the second surgery. The second surgery is what led to the bleeding and required the third. That surgery is what required the second stage [urethroplasty]. And the sum total of all these operations is what led to this man's intractable pain. So that I believe that this has been a chain of events initiated by surgery that wasn't required in the first place.

In addition to the testimony of Dr. Fair and Dr. Chehval, the depositions of Dr. Fabian and Dr. Chunduri were read to the jury. The medical records from Deaconess, Incarnate Word, St. Mary's and Barnes Hospitals were admitted into evidence, as well as the medical records of Dr. Bergmann, Dr. Fair and Chehval.

Defendant testified that before the "Y–V plasty" surgery was performed he had advised plaintiff that he would be sterile following the surgery. In addition, Dr. Gary Storey, a urologist, testified as an expert witness for defendant. He testified that in 1976 "Y–V plasty" surgery was routinely performed. He reviewed the medical

records relating to plaintiff's condition including the hospital admissions to Missouri Baptist, Deaconess, Barnes and Incarnate Word; "depositions from the various doctors involved, even someone from Johns Hopkins [1]" and concluded that defendant's condition in 1976 warranted "Y–V plasty" surgery.

In closing argument, defendant's attorney stated:

[Dr. Chehval] comes in and he criticizes the Y–V plasty and Dr. Chehval has never even performed one. Dr. Fair, in his short number of years in practice, has done twenty-five of them. For a discredited operation? Take that into consideration, members of the jury, when you deliberate. And I think you'll conclude that the Y–V plasty was indicated.

There is something as important as the presence of evidence during the course of the trial. Also equally important is the absence of evidence. What do I mean by that? You arrive at certain conclusions and you're going to deliberate and make certain judgments about this case based upon what you heard. I'm going to also ask you to take into account what you didn't hear because I think it's critical. And I think it would be very important if I were deciding any of the issues in this case, and I think the absence of it is glaring.

Dr. Fair says, after he can't find any urologic cause for the man's pain, "We're going to send you to Johns Hopkins." A world-renowned hospital facility. I said, "Dr. Fair, you wrote Dr. Rybock?" He wrote him an extensive report. He send him a lot of records. "Did you ever talk to Dr. Rybock afterwards?" "Much to my chagrin," and he used the word 'chagrin', "much to my disappointment I never communicated with him." Where are the records from Johns Hopkins?

Plaintiff objected, but the objection was overruled by the trial court. Defendant's attorney continued:

Where are the records from Johns Hopkins? Why didn't you have the benefit of that? You know, when you don't bring in evidence that particularly relates to you, the law says something about this, and it says that you may conclude, you as jurors and each and every one of you, may conclude that Johns Hopkins' medical records would not support Mr. Alexander's claim that his problems are related to anything Dr. Bergmann did. You may infer that. You may conclude that because they didn't bring them in.

Go back to the Instruction No. 2, Instruction No. 3, "The burden is on the plaintiff." They elected not to present that evidence to you. I asked Mr. Ebert to explain why.

. . . . .

Why didn't you have the testimony or the evidence from Johns Hopkins? I leave it up to you to decide why you didn't. But you may infer that it would not have been favorable.

This case was tried in May, 1982. In February, 1981, a copy of plaintiff's medical records from Johns Hopkins were mailed to defendant's attorney. In addition, the records, as well as the correspondence with defendant's attorney concerning them, were attached to plaintiff's motion for a new trial.

▮▮▮ Plaintiff's lone point on appeal is that the trial court erred in overruling his objection to defendant's adverse inference argument. Defendant's argument went to both the failure to produce medical testimony, as well as to medical records. In Missouri, the failure of a party to call a witness having knowledge of the facts and circumstances vital to the case generally raises a presumption that the testimony would be unfavorable to the party failing to proffer it. *Leehy v. Supreme Express & Transfer Co.*, 646 S.W.2d 786, 790 (Mo. banc 1983). This rule applies as equally to documentary evidence as to witnesses. *In re Weingart's Estate*, 170 S.W.2d 972, 982

---

1. There is no evidence in the record to suggest a deposition from any doctor at Johns Hopkins was taken. The doctor was probably referring to the Johns Hopkins' medical records.

(Mo.App.1943). *See St. Louis County v. Szombathy*, 497 S.W.2d 144 (Mo.1973); *McNeil v. Fidelity Casualty Co.*, 336 Mo. 1142, 82 S.W.2d 582, 588 (1935). However, a plaintiff in a medical malpractice action has never been under an obligation to call as a witness *every* doctor he has seen, or else the defendant can argue that the missing doctor would not have supported the claim of malpractice. *Gridley v. Johnson*, 476 S.W.2d 475, 479 (Mo.1972).

 It necessarily follows that if counsel is allowed to argue an adverse inference raised by such a presumption; it must logically relate to the facts and circumstances about which the witness would have testified or to which the records related. In the case under review, neither the testimony nor the records were related to the inference defense counsel articulated to the jury. Defendant's argument to the jury immediately before the adverse inference dealt with whether the defendant properly diagnosed plaintiff's condition in 1976. He then implied that plaintiff was sent to Johns Hopkins by Dr. Fair in order to determine the cause of plaintiff's pain. Finally, he asked the jury to conclude that the missing evidence would not support plaintiff's "claim that his problems are related to anything Dr. Bergmann did." That is, that the evidence was related to whether defendant breached his duty to plaintiff and/or whether that was the proximate cause of plaintiff's pain. Our review of the record establishes that plaintiff's treatment at Johns Hopkins was to enable him to learn to live with the pain. We find scant evidence in the record that plaintiff's treatment at Johns Hopkins would have had a bearing on the issues raised by defendant.[2] The trial court erred in allowing defendant to argue this adverse inference to the jury.

Reversed and remanded for a new trial.

KAROHL, P.J., and CRANDALL, J., concur.

---

**2.** The evidence was clearly related to the degree to which the clinic was successful in allowing plaintiff to live with the pain and consequently related to the issue of plaintiff's damages. A

portion of defendant's argument not produced here could be treated as properly commenting on that fact.