Bruce D. **FOSTER**, Plaintiff/Appellant,

v.

**BARNES–JEWISH HOSPITAL**, Donald G. Sessions, and Washington University, Defendants/Respondents,

and

Charles Tseng, Defendant.

No. ED 78002.

Missouri Court of Appeals, Eastern District, Division Five.

April 24, 2001.

Rocco A. Marrese, Edwardsville, IL, for appellant.

Stephen G. Reuter, Moser and Marsalek, P.C., Robyn G. Fox, Catherine M. Vale, St. Louis, MO, for respondents Don-

ald G. Sessions and Washington University.

Paul N. Venker, Armstrong Teasdale LLP, Thomas B. Weaver, Cynthia A. Sciuto, St. Louis, MO, for respondent Barnes–Jewish Hospital.

KATHIANNE KNAUP CRANE, Judge.

Plaintiff filed a lawsuit to recover damages for medical malpractice alleged to have caused the death of his mother. The trial court entered judgment for defendants in accord with the jury verdict. On appeal, plaintiff asserts that the trial court erred in refusing certain tendered jury instructions and in making certain evidentiary rulings. We affirm.

On September 28, 1995, Ruth Anna Foster (the patient), mother of plaintiff Bruce D. Foster, died at defendant Barnes–Jewish Hospital, where she had been a patient for ten days. She had been admitted to the hospital on September 18, 1995 after suffering a severe nosebleed. On September 18 and 19 the patient was treated on the otolaryngology ward by defendant Donald G. Sessions, M.D., who was an employee of defendant Washington University, defendant Charles Tseng, M.D., who was an employee of Barnes–Jewish, and staff doctors and nurses who were employees of Barnes–Jewish. On September 19 the patient went into respiratory arrest. The patient developed Acute Respiratory Distress Syndrome (ARDS), which resulted in her death.

In March, 1998 plaintiff filed this action to recover damages for negligence and wrongful death from Barnes–Jewish, Dr. Tseng, Dr. Sessions, and Washington University. The case was subsequently tried to a jury.

Plaintiff's theory of the case at trial was that the patient's nasal packing slipped, which caused post-obstructive pulmonary edema, which, in turn, caused the patient to suffer ARDS. Plaintiff's expert testified to his opinion that the medical caregivers breached the standard of care in two respects: first, they did not assess the patient properly and ensure that she was placed in a safe monitoring and care environment, second, the patient was not monitored appropriately, both with respect to the nasal packing and to the bleeding and volume resuscitation. He testified that Dr. Tseng was responsible for the decision to place her on the otolaryngology ward instead of the intensive care unit (ICU) and that Dr. Sessions was responsible for concurring with this assessment. He testified that the nursing staff was responsible for not ensuring that the patient was in a safe environment and not charting direct observations of the nose pack and that Dr. Tseng and Dr. Sessions were responsible for not ordering more frequent checks of the nose pack.

Defendants' defense was that the nasal packing had not slipped and caused ARDS but that the ARDS resulted from the patient's aspiration of blood and other secretions into her lungs. Defendants adduced expert testimony that the patient was placed in an appropriate environment for monitoring, that the doctors' orders were appropriate under the circumstances, and that the patient's caregivers acted well within the standard of care.

After the close of the evidence, plaintiff dismissed Dr. Tseng with prejudice. The case was submitted to the jury on plaintiff's claims against Barnes–Jewish and Washington University.

I. *Instructional Error*

In his first point, plaintiff asserts that the trial court abused its discretion in refusing to give to the jury his proposed verdict directing Instructions A and B, each of which submitted an alternate

ground of breach of the standard of care that the respective physicians or physician failed to monitor the patient's condition properly. Plaintiff contends these alternative submissions of negligence were supported by substantial evidence.[1]

A party is entitled to any instruction that is supported by substantial evidence. Kauzlarich v. Atchison, Topeka, and Santa Fe Ry. Co., 910 S.W.2d 254, 258 (Mo. banc 1995). Where an instruction is disjunctive, all submissions must be supported by substantial evidence. Elfrink v. Burlington N. R.R. Co., 845 S.W.2d 607, 611 (Mo.App.1992). However, refusal of a disjunctive paragraph in a verdict director, even one that is supported by the evidence, is not grounds for reversal unless the failure to submit the instruction materially affected the outcome of the case. Blackstock v. Kohn, 994 S.W.2d 947, 953 (Mo. banc 1999). To obtain reversal, the complaining party must show prejudice from the refusal of an instruction. Hackman v. Kindrick, 882 S.W.2d 157, 159 (Mo. App.1994); Titsworth v. Powell, 776 S.W.2d 416, 423 (Mo.App.1989).

The elements of a claim for medical malpractice are: 1) the defendant's act or omission that failed to meet the requisite medical standard of care, 2) negligent performance of that act or omission, and 3) a causal connection between the act or omission and the plaintiff's injury. Yoos v. Jewish Hosp. of St. Louis, 645 S.W.2d 177, 183 (Mo.App.1982). The basic philosophy in malpractice cases is that the doctor is negligent by reason of the fact that he or she has failed to adhere to a standard of reasonable medical care and that consequently the service rendered was substandard and negligent. Aiken v. Clary, 396 S.W.2d 668, 673 (Mo.1965). This point concerns disjunctive submissions defining

the acts or omissions alleged to have failed to meet the requisite medical standard of care.

*Instruction A*

Plaintiff sought to submit the negligence of Barnes–Jewish by Instruction A, which was a modification of MAI 20.02 [1983 Revision] and was worded as follows:

Your verdict must be for plaintiff against Barnes–Jewish Hospital if you believe:

First, plaintiff Bruce D. Foster is the son of Ruth Anna Foster, and

Second, Charles Tseng, M.D., Patt[y] Lee, M.D., Erika Martin, M.D. and certain other healthcare providers who were employees of Barnes–Jewish Hospital cared for and treated Ruth Anna Foster, and

Third, either:

defendant Barnes–Jewish Hospital's nurses failed to properly monitor Ruth Anna Foster's condition;

or

**defendant Barnes–Jewish Hospital's resident physicians, Dr. Charles Tseng, Dr. Erika Martin and Dr. Patt[y] Lee, failed to properly monitor Ruth Anna Foster's condition;**

or

defendant Barnes–Jewish Hospital's resident physicians, Dr. Charles Tseng, Erika Martin and Dr. Patt[y] Lee, failed to place Ruth Anna Foster in a safe environment for monitoring, and

Fourth, defendant Barnes–Jewish Hospital's employee[ (s) ] in any one or more of the respects submitted in paragraph Third was (were) thereby negligent, and

1. These errors should have been raised in separate points.

Fifth, as a direct result of such negligence Ruth Anna Foster died.

(Emphasis added.)

The court refused to give this instruction, but gave Instruction 8, also a modification of MAI 20.02 and also requested by plaintiff, but which did not contain the disjunctive that is set out in the bold-faced language in Instruction A above.

Plaintiff argues that the submission of the disjunctive that the resident physicians "failed to properly monitor" the patient's condition was supported by the testimony of David M. Rodman, M.D. that the physicians failed to order appropriate tests to monitor the patient's blood volume, which tests "would have indicated that there was a continual bleed saturating the nasal packing which then slipped and caused an obstruction.... " He argues that as a result of the refusal of these instructions he was precluded from arguing this failure to monitor as a basis for liability.

*Instruction B*

By Instruction B, plaintiff sought to submit the negligence of Washington University. It was based on MAI 20.02 and contained the following language:

Your verdict must be for plaintiff against Washington University if you believe:

First, plaintiff Bruce D. Foster is the son of Ruth Anna Foster, and

Second, defendant Washington University's employee, Dr. Donald Sessions, cared for and treated Ruth Anna Foster, and

Third, **either:**

**defen[d]ant Dr. Donald G. Sessions failed to properly monitor Ruth Anna Foster's condition;**

**or**

defendant Dr. Donald G. Sessions failed to place Ruth Anna Foster in a safe environment for monitoring, and

Fourth, Dr. Donald Sessions, in any one or more of the respects submitted in paragraph Third was thereby negligent, and

Fifth, as a direct result of such negligence, Ruth Anna Foster died.

(Emphasis added.)

The court refused Instruction B but gave Instruction No. 10, also based on MAI 20.02 and also submitted by plaintiff, but which did not contain the disjunctive that is set out in the bold-faced language above in Instruction B.

Plaintiff argues that the submission of the disjunctive that Dr. Sessions "failed to properly monitor" the patient's condition was supported by evidence that Dr. Sessions deviated from the standard of care when he concurred in the supervising attending physician's assessment and care plan, failed to order frequent checks of the nose pack, and failed to order appropriate tests to monitor the patient's condition.

*Discussion*

■ Plaintiff submitted two verdict directing instructions for each defendant. One, which was given, submitted the physicians' breach of the standard of care as the failure to place the patient in a safe environment for monitoring. The other submitted this alternative as well as the physicians' failure "to properly monitor the patient," which, plaintiff argues, is based on evidence that the respective physicians failed to make appropriate orders for the patient to be monitored.

The trial court did not prejudicially err in giving instructions that contained one submission based on the physicians' failure to ensure that the patient was properly monitored instead of two submissions based on this theory. In Kampe v. Colom, 906 S.W.2d 796 (Mo.App.1995), one paragraph of the verdict directing instruction

charged that the defendant doctor failed to monitor the medications he prescribed for the plaintiff. *Id.* at 803. There was evidence that the doctor had failed to monitor in three different respects: that he had failed to keep adequate prescription records, failed to recognize side effects exhibited by the patient, and failed to order blood tests to determine whether the patient was taking his medication properly. *Id.* at 804. The Western District held that the instruction charging failure "to monitor," when applied to the evidence in the case, asked whether the defendant doctor "observed, oversaw, supervised, or regulated" the plaintiff's use of the prescribed medication. *Id.* at 805. It held that the exact method by which the doctor could have "observed, overseen, supervised, or regulated" the amount of prescribed medication need not be determined by the jury. *Id.* Although *Kampe* involved the question of whether the instruction charging a failure "to monitor" constituted a roving commission, it illustrates that one submission on failure to monitor can be based on evidence of different ways the physician failed to monitor.

■ The evidence that the defendant physicians did not admit the patient to a unit where the patient would have received more frequent observation and testing and the evidence that the defendant physicians did not write orders for more frequent observation and testing supported either a submission of "failure to properly monitor" or "failure to place in a safe environment for monitoring." The trial court gave the instructions requested by plaintiff that contained one submission on the physicians' failure to monitor. The submission of failure to place the patient in an appropriate environment for monitoring encompassed the physicians' decisions not to put the patient in an ICU for a higher degree of monitoring as well as the physicians' failure to order that higher degree of monitoring through more frequent tests and checking. Plaintiff could properly argue all of this evidence under this instruction. In closing argument, plaintiff's counsel argued both the physicians' failure to monitor and the failure to order more frequent tests as part of the physicians' failure to put the patient in a safe environment.[2] We may look at counsel's argument to assess prejudicial impact. Dierker Assocs., D.C., P.C. v. Gillis, 859 S.W.2d 737, 745 (Mo.App.1993). Thus, the trial court's refusal to submit Instructions A and B was not prejudicial because it did not prevent plaintiff from arguing and the jury from considering the evidence that the physicians failed to order more frequent tests.

The trial court's refusal to give Instructions A and B, which each had two submissions on breach of a duty in connection with the patient's monitoring, did not materially affect the outcome of the case. Point one is denied.

## II. *Cross–Examination with Medical Text*

■ In his second point, plaintiff contends that the trial court abused its discretion in sustaining defendants' objection to plaintiff's cross-examination of Patty Lee,

2. Plaintiff's counsel specifically argued:
   "The resident doctors who work for Barnes–Jewish didn't respond to those tests. That's a lack of monitoring. Nurses monitor Ruth Anna Foster according to the orders. But the orders were faulty. They called for monitoring her every eight hours."

   "Dr. Rodman told you the evidence is that they failed to monitor the patient and all the health care providers failed to monitor the patient. They failed to put her in a safe environment and that you can't get ARDS from blood."

M.D., a Barnes–Jewish physician, with a medical text, *Principles of Surgery.* Plaintiff argues that the textbook was authoritative and the trial court's ruling prejudiced him because it denied him impeachment testimony crucial to his theory of the case. We disagree.

■ In order to use a scientific text in the examination of an expert witness, counsel must first adduce evidence that the text is authoritative, that is, that it is generally accepted and accredited within the profession. Grippe v. Momtazee, 705 S.W.2d 551, 556 (Mo.App.1986). When this prerequisite is met, counsel may then cross-examine a medical expert by framing a proposition in the exact language of the text or treatise and asking the witness whether he or she agrees to it. Gridley v. Johnson, 476 S.W.2d 475, 481 (Mo.1972); Crain v. Newt Wakeman, M.D., Inc., 800 S.W.2d 105, 107 (Mo.App.1990).

In this case plaintiff's counsel did not follow this procedure. Instead, without identifying the text he was using, plaintiff's counsel asked Dr. Lee:

Q: Doctor, do you agree with this statement, measurement of hematocrit—

Barnes–Jewish's counsel interposed an objection, and the court heard objections from all defendants at sidebar:

MR. VENKER: Judge, I want to object on two grounds. One, beyond the scope of direct because nobody asked Dr. Lee about this text or anything. Secondly, I don't think the foundation's been laid to be able to cross-examine her out of this text.

* * *

MR. REUTER: Join in that objection. That's a lack of foundation. I don't even know what text [he's] reading from at this point.

The court sustained the objection.

While the jury was deliberating, plaintiff's counsel made an offer of proof by reading the following passage from a textbook, *Principles of Surgery:*

Values for normal blood volume are variable. And the technique of measurement are relatively inaccurate when there is a rapidly changing situation such as hemorrhage. Chronically ill and elderly patients have a diminution of blood volume. In cardiac patients with cardiac decompensation the blood volume may be greater than normal. Many patients with chronically reduced blood volume are well accommodated to that volume. The measurement of hemoglobin or hematocrit is also used to interpret blood loss. This measurement is misleading in the face of acute blood loss since the hematocrit may be normal in spite of a severely contracted blood volume.

The trial court then explained its prior ruling: "[T]he Court's ruling with regard to this particular item Plaintiff's Counsel wanted to read into the record to, I assume, impeach Patty Lee, the physician who was here testifying, was not based upon whether or not it was an authoritative text or even commonly used. It was based on an improper procedure that was used while trying to impeach the witness with this particular document."

■ The trial court did not abuse its discretion in sustaining the objection to the cross-examination for failing to follow the proper procedure. Counsel did not identify the text he was apparently reading from, and he paraphrased the text rather than read the exact language. We will uphold a trial court's evidentiary rulings if proper on any ground, even if not the ground asserted. Franklin v. Friedrich,

470 S.W.2d 474, 476 (Mo.1971); Aliff v. Cody, 26 S.W.3d 309, 314–15 (Mo.App. 2000). Counsel had the responsibility to use the proper procedure to cross-examine from a medical text. *Gridley,* 476 S.W.2d at 481; *Crain,* 800 S.W.2d at 107.

Point two is denied.

III. *Admission of Exhibit P*

■ In point three plaintiff claims that the trial court erred in overruling his objection to the admission of defendants' Exhibit P, a medical article written by defense expert Thomas Hyers, M.D. However, in his motion for new trial, plaintiff did not assert that the trial court had erred in admitting Exhibit P. If an appellant fails to include a point of error in his motion for new trial, he preserves nothing for review. Rule 78.07(a)(1); Emery v. Wal– Mart Stores, Inc., 976 S.W.2d 439, 447 (Mo. banc 1998). We find no substantial grounds for plain error review. Point three is denied.

*Conclusion*

The judgment of the trial court is affirmed.

MARY K. HOFF, C.J. and CHARLES B. BLACKMAR, Sr.J., concur.