Robert CRAIN, Plaintiff–Appellant,

v.

NEWT WAKEMAN, M.D., INC., Individually and as a Professional Corporation, Defendants–Respondents.

No. 16732.

Missouri Court of Appeals, Southern District, Division Two.

Nov. 9, 1990.

Motion for Rehearing or Transfer Denied Dec. 3, 1990.

Application to Transfer Denied Jan. 9, 1991.

Elwyn L. Cady, Jr., Independence, for plaintiff-appellant.

Gail L. Fredrick, Freeman, Fredrick & Rogers, Springfield, for defendants-respondents.

SHRUM, Judge.

Robert Crain (plaintiff herein) filed a medical malpractice lawsuit against Newt Wakeman (defendant herein). Plaintiff claimed defendant was negligent in (a) prescribing Amitriptyline Hydrochloride for plaintiff without advising plaintiff of the possible side effects; (b) failing to perform adequate history and physical exam of plaintiff; (c) continuing to direct use of the drug in the face of adverse reactions thereto; (d) failing to monitor or adjust dosage as directed by the manufacturer; and (e) failing to provide appropriate therapy for alleged drug reaction sustained by plaintiff. Judgment was entered for defendant

following jury verdict. Plaintiff appeals. This court affirms.

In Point I, plaintiff claims the trial court erred in overruling plaintiff's motion for mistrial predicated upon alleged prejudicial misconduct of jurors because of comment and discussion by jurors before the case was concluded and before retiring to the jury room for deliberations. Plaintiff moved for the mistrial during a recess taken at the conclusion of the presentation of evidence by defendant. Plaintiff testified that as he walked through the courthouse hallway and started down the stairs, he dropped his coat. He bent to pick up the coat and then heard a female voice say, "I'm for the doctor. If he wants to drink himself to death, that's his business."[1] Plaintiff said he then turned around, looked up the landing, and saw "a couple of ladies standing there." Plaintiff testified he didn't know who made the remark. Later, all female jurors testified and denied making the remark. After the female jurors testified, plaintiff was asked if he recognized any of the voices. He replied, "[T]he voice that I believe I heard was the lady there, Mrs. Phillips [a juror]." Plaintiff "did not see who said it." He remembered seeing "the lady in tan slacks [Mrs. Phillips]. Now, whether she said it or not, I don't know."

Juror Perkins was in the hallway during the recess but denied saying anything about the case. Juror Shipman was not in the hallway; she had gone downstairs, to the rotunda, to make a call to her husband. Juror Phillips denied talking about the case.[2] Juror Miller also denied talking about the case. She did say that while in the hallway during the recess, some man, who was on the jury, made the statement, "I wonder ... why they didn't set an amount" to "us girls." "And then they

said they haven't had their summation yet. We've still got to have that summation. And I said, 'No, I think they're through'.... And I said, 'I think now we're just going to go to the jury,' and that was all that was said. I went outside and walked to my car." Following the presentation of the above evidence, plaintiff argued that the conversations were prejudicial and contrary to the admonition of MAI 2.01. The trial court denied plaintiff's motion for mistrial.

■■■■ The granting of a new trial because of juror misconduct is within the sound discretion of the trial court. *Berry v. Allgood*, 672 S.W.2d 74, 78 (Mo. banc 1984); *Green v. Lutheran Charities Ass'n*, 746 S.W.2d 154, 157 (Mo.App.1988). The trial court's discretion will not be disturbed on appeal absent a showing of abuse. *Baumle v. Smith*, 420 S.W.2d 341, 347 (Mo.1967); *Beste v. Tadlock*, 565 S.W.2d 789, 791 (Mo.App.1978). The test to be applied is set forth in *Berry v. Allgood*, *supra*, at 77, as follows:

> Parties and jurors should avoid all appearance of evil, and if any contact *motivated by improper design appears*, the jury should ordinarily be discharged or a new trial granted, regardless of the existence of actual prejudice.... Where a juror, by some inquiry or voluntary statement has raised a question as to his impartiality, the question becomes essentially one of fact, and primarily this decision rests with the trial court.... (Emphasis supplied)

Here, the record does not disclose the basis for the trial court's denying plaintiff's motion for a new trial. The record certainly does not indicate any improper design by anyone in connection with the alleged remarks, either by jurors, litigants, or their attorneys. In truth, there is no direct evi-

---

1. The record was replete with testimony of plaintiff's drinking and abuse of alcohol.

2. Juror Phillips did say:

   A. ... I didn't say anything about the doctor. We were talking about this lady's knee surgery and someone said she had gone to doctor so and so and someone else said that they thought the name had been mentioned sometime or another, and that was—

   Q. [By plaintiff's counsel]: During the case here?

   A. Yes.

   Q. One of the other doctor's names came up in this case or—

   A. We—but we were talking specifically about this other lady's knee surgery rather than the case.

dence that a jury member made the "I'm for the doctor" remark. The trial court may have believed (a) the remark was not made; or (b) if the remark was made, it was not made by a juror; or (c) if the remark was made by a juror, it was not made in the presence of other jurors; or (d) if the remark was made by a juror and was in the presence of other jurors, the remark demonstrated a misunderstanding of the law of the case which might be corrected by jury instructions or explanation by other jurors during deliberations. *Baumle, supra,* at 348.[3] In such case, there is room for the exercise of the court's discretion in determining this fact question. *Baumle, supra,* at 348. As to the other remarks which Juror Phillips and Juror Miller testified about, reasonable minds could differ on the interpretation to be placed on the statements. The jury is presumed to have followed their oaths and rendered a verdict according to the evidence. *Christie v. Gas Service Co.,* 347 S.W.2d 135, 144 (Mo.1961); *Beste, supra,* at 792. No abuse is found in the trial court's denial of plaintiff's motion for mistrial. Point I is denied.

■■■ Plaintiff claims in Point II that the trial court erred in unduly restricting cross-examination of defendant on the medical literature dealing with the basic issue of the relation between Amitriptyline administration and life-threatening heart impairment. In a civil case, the extent and scope of cross-examination is discretionary with the trial judge and its ruling will not be disturbed except where a clear abuse of discretion is shown. *Cash v. Bolle,* 423 S.W.2d 743, 746 (Mo. banc 1968); *Lewis v. Envirotech Corp.,* 674 S.W.2d 105, 112 (Mo.App.1984); *Cantrell v. Superior Loan Corp.,* 603 S.W.2d 627, 641 (Mo.App.1980). However, under Missouri law it is proper to cross-examine a medical expert by framing a proposition in the exact language of the author of a medical textbook or treatise and asking the witness whether he agrees

to it. *Gridley v. Johnson,* 476 S.W.2d 475, 481 (Mo.1972).[4] A trial court should not disallow such cross-examination because the witness says he is not familiar with the book or did not recognize it as authoritative. *Gridley, supra,* at 480–81. It is, however, a prerequisite to the use of scientific texts and treatises in the examination of an expert witness that there be evidence that they are authoritative. *Grippe v. Momtazee,* 705 S.W.2d 551, 557 (Mo.App. 1986). There has to be some evidence of general acceptance and accreditation of the text or treatise within the profession. *Grippe, supra,* at 556. Evidence of the authoritative nature of the text or treatise may be (a) conceded by the witness himself, or (b) established by judicial notice, or (c) established by other experts in the field. *Kansas City v. Dugan,* 524 S.W.2d 194, 197 (Mo.App.1975). Here, plaintiff failed, in some instances, to read from the texts or treatises upon which he was relying and then ask defendant if he agreed. In other instances, he failed to establish the authoritative nature of the text or treatise he was attempting to use in cross-examining defendant.

The first series of trial court rulings claimed by plaintiff to be error was in the following context:

Q. [By plaintiff's counsel]: Were you aware of the investigation dealing with the relation of Amitriptyline to the heart back in about 1965?

A. [By defendant]: No, I wasn't.

Q. Have you been brought up to date since about that? Are you familiar with that committee that was set up to explore that particular problem—

A. No, I'm not—

Q. By the basic bodies in our country—

[Defendant's counsel]: Let me object to the form of the question.... [I]t assumes facts not in evidence.

---

3. In *Baumle v. Smith,* 420 S.W.2d at 347, an affidavit was filed by plaintiff and his attorney on the day the verdict was returned in which it was alleged that the foreman of the jury had made a statement in their presence, "I used to work as a truck driver,—I wouldn't have brought back a verdict against the truck driver if he had a thousand feet to stop in."

4. Exact directions on how to use authoritative treatises was set forth in *Hemminghaus v. Ferguson,* 358 Mo. 476, 490, 215 S.W.2d 481, 489 (1948), as follows: "[T]hey [text books on technical subjects] may be used in cross-examination of an expert witness by reading therefrom and inquiring whether the witness agrees therewith."

THE COURT: Sustained.

Additional questions, having the same thrust, were met with defendant's objections that the question assumed facts not in evidence, was vague and ambiguous as to some broad field of literature and not specific as to any particular publication or writing. The trial court sustained the objections. Following a lengthy off-record discussion, the trial court again sustained another objection and said: "Suggest you get right to the specific literature you're talking about.... My understanding of the law is that you ... are entitled to cross-examine on medical literature, but you need to identify what it is you are talking about...."

Ultimately, plaintiff did read from an article in the American Heart Journal, December 1969, Volume 78, page 757, and then asked defendant, "Authors demonstrate that association of, arrhythmia, sudden death, with another psychotrophic [sic] drug, Phenothiazine therapy. That's another psychotrophic [sic] drug, Phenothiazine, and I'm asking you if you—do you agree with that proposition." Defendant answered, "I can't disagree with it." Defendant agreed that the drug Imipramine is a closely related drug to Amitriptyline. Then plaintiff asked:

Q. And I'd ask you if you agree with the statement that ventricular arrhythmia and death is caused by acute poisoning with—have recently—

[Defendant's counsel]: Objection, irrelevant and immaterial. That's not even the drug that was given. There's no reference to Amitriptyline. It's irrelevant and immaterial.

THE COURT: Well, I'll sustain the objection.

Plaintiff then asked a series of questions intended to establish the similarity of Phenothiazine and Amitriptyline. This was followed by a question as to whether or not defendant would agree that "sudden death complications of the administration of these—*these types of drugs*—." (Emphasis added). At that point, defendant's counsel again objected that the question was immaterial and irrelevant and the objection was sustained. The record never shows an effort by plaintiff to read from a treatise or other document that sudden death complications could result from the administering of Amitriptyline. No error warranting reversal resulted from this ruling by the trial court.

Finally, plaintiff asked defendant about an article by Professor Tulane contained in Psychiatric Annals, Volume 5, November 1975. Defendant denied being familiar with that particular journal. He admitted familiarity with "Tulane." When asked if Tulane might write "authoritatively in a journal called Psychiatric Annals back in 1975," defendant answered, "He might write for it but of his own opinion." Plaintiff then started to quote from the publication. Defense counsel objected that there was a "lack of foundation as to the authoritative nature." The objection was sustained. Plaintiff made no offer of proof or other effort to establish the authoritative nature of the article. This record does not reveal that plaintiff ever laid the necessary foundation to use medical texts and treatises in cross-examining defendant.[5] No prejudicial error is found in the trial court's rulings on the cross-examination questions propounded to defendant. Point II is denied.

Judgment affirmed.

PARRISH, P.J., and HOGAN, J., concur.

---

5. This court has searched the record before it for the deposition of plaintiff's expert witness, Dr. David Michael Baker, M.D., in an effort to discover whether or not, through deposition testimony, plaintiff qualified the article of Professor Tulane contained in Psychiatric Annals, Volume 5, November 1975, as an authoritative text. That deposition is not contained in the record.

This court is entitled to assume that the omitted deposition from the record is unfavorable to plaintiff. *Board of Regents v. Harriman*, 792 S.W.2d 388, 393–94 (Mo.App.1990). *See also Daniels v. Griffin*, 769 S.W.2d 199, 201 (Mo.App. 1989); *Delf v. Cartwright*, 651 S.W.2d 622, 624 (Mo.App.1983).