Gregory K. EMBREE, Plaintiff–Appellant,

v.

NORFOLK & WESTERN RAILWAY COMPANY, Defendant–Respondent.

No. 66763.

Missouri Court of Appeals, Eastern District, Division Two.

Oct. 3, 1995.

John G. Carlson, Daniel J. Cohen, Edwardsville, IL, Martha Melinda Sanderson, St. Louis, for appellant.

Stephen M. Schoenbeck, St. Louis, for respondent.

DOWD, Judge.

Employee appeals from the judgment after a jury verdict in favor of Norfolk & Western Railway (Employer) in an action pursuant to the Federal Employer's Liability Act (FELA), 45 U.S.C. § 51 *et seq.* We affirm.

Employee began working for employer as a trackman in 1978. A trackman is a labor intensive position with responsibilities of maintaining railway tracks and crossings. A trackman's duties include repairing "pull aparts"—imperfections in the rails caused by the shrinking of the metal under cold conditions. One method for repairing pull aparts required diesel fuel and sawdust to be combined and burned on the rail to allow expansion so that the rail may be hammered back

into place. The diesel fuel was stored in fifty-five gallon drums and was hauled to the job site on the bed of a truck. During the process of repairing pull aparts, diesel fuel was sometimes spilled at the job site. Although Employer was aware of spilling, it had no procedure or requirement to clean the job site.

Employee alleged that on December 29, 1989, he was a member of a work crew near Orrick, Missouri. On that morning, his supervisor asked him to go to Kansas City to undergo a random drug test. Following administration of the test, the track supervisor, Henry Johnson, instructed Employee to return to Orrick. Employee said he returned to the work site at approximately 1:00 p.m. and found his crew was absent. He decided to clean the work site on what was described as a drizzly day.

After cleaning the work site, Employee attempted to retrieve some of his personal belongings from the cab area of the work truck. He was shod in good boots and the running board was corrugated so he was unconcerned that the running board appeared damp when he stepped up on it to access the cab. However, according to Employee, his foot slipped as he hoisted himself up, and he fell to the ground upon his buttocks and jammed his left hand. Employee lay prone for approximately fifteen minutes fearing he had broken his back. He noticed several nearby puddles topped with floating diesel fuel and concluded the area was slick with the spilled diesel and caused his fall. There were no witnesses to this alleged fall.

Employee eventually got to his feet. The depot telephone was locked, and Employee was unable to call for assistance or to report the incident by phone. He did manage to write a note to his foreman concerning his injury in order to comply with Employer's policy that all injuries be reported. Employee drove to Moberly Regional Medical Center. Because of the pain he allegedly was experiencing, he did not report to Employer's nearby office but drove directly to the hospital.

Once at the hospital, he phoned his wife and had her bring his phone book with supervisor Hendricks' number in it. Supervisor Hendricks sent Employer representative John Darwent to the hospital. Darwent asked Employee to submit to another drug test, and he complied. Darwent further requested Employee accompany him to the work site to demonstrate what had happened. Employee refused this request claiming to be in too much pain. At the hospital, X-rays were taken of Employee. He was advised to go home and lie flat on his back.

At trial, each party introduced medical experts to describe Employee's physical condition. Employee presented two of his treating physicians, Dr. Larry Bader, an osteopath, and Dr. Robert Silvers, a neurologist. Dr. Bader diagnosed Employee as suffering from "sacral shear." He described sacral shear as a condition of strained and pulled ligaments in the sacroiliac region that predisposes the sufferer to recurrent somatic dysfunction. He stated that Employee's sacral shear was caused by his fall and that it has and will cause Employee pain and suffering. He said that Employee's sacral shear was permanent and not susceptible to surgical treatment. In Dr. Bader's opinion, Employee could no longer be an industrial laborer. Dr. Bader further diagnosed Employee had suffered a compression fracture of the spine at L1–L2 as result of his fall. He also noted problems at the L4–L5 level.

Dr. Silvers testified that Employee's fall caused him to suffer a lumbar spinal injury— a probable lumbar sprain and a possible disc protrusion. In his opinion, Employee would have continuing pain and it would be inadvisable for him to engage in heavy industrial work. He also diagnosed a degenerative disc disease that "likely" was accentuated or exaggerated by the fall. Dr. Silvers was unfamiliar with the term "sacral shear."

Employer presented the deposition of Dr. Robert Tatkow, who had examined Employee at Employer's request. In Dr. Tatkow's opinion, Employee had suffered a sprain to his back, a nonpermanent injury with minimal recovery time. He also diagnosed degenerative disc disease at L4–L5 and developmental anomalies of the lumbar that were causally unrelated to Employee's alleged fall.

Dr. Tatkow was asked if he was familiar with the condition of sacral shear. Dr. Tatkow responded he was not and that his review of medical literature yielded no discussion of this alleged condition.

Dr. John Fries, a radiologist, testified for Employer based on his examination of Employee's X-rays and medical reports. He diagnosed an abnormality at the L5 but could not determine whether it was caused by aging, trauma or a combination of aging and trauma. He disagreed with Dr. Bader's opinion that Employee had suffered a compression fracture. He further stated that the medical texts do not recognize the condition of sacral shear.

Additional evidence presented or elicited by Employer was as follows. In May of 1989, Employee was informed that he had tested positive for marijuana during a recent physical. Employer informed Employee that its policy forbade persons dependent on prohibited drugs from working. Employee's services were terminated until he rid his system of the drug. Arrangements were provided for submitting to additional tests to determine whether his system was clear. Failure to submit would expose Employee to permanent dismissal.

Employee submitted to the follow-up drug test. Employer sent and Employee received a letter dated June 2, 1989, to Employee that read:

> You recently gave another urine sample for drug screening. This recent sample tested negative and you will be returned to service. I remind you, however, that the use of prohibitive drugs is contrary to company policy. You are therefore instructed to keep your system free of such substance. During the first three years following the return to work, you may from time to time be required by me to report to a medical facility for further testing in order to determine that you are no longer using marijuana or other prohibitive drugs. *Should a further test be positive, you will be subject to dismissal.* (Emphasis added).

On December 29, 1989, the day of Employee's alleged accident, Employer requested he report to Kansas City, Missouri, to submit to a drug test. Supervisor Henry Johnson accompanied Employee to Kansas City. Johnson testified that Employee appeared nervous and moved his legs a lot. The first urine sample provided by Employee was rejected because it was cool. Plaintiff provided a second urine sample. This sample as well as the urine sample given by Employee at Moberly Hospital following his alleged accident tested positive for marijuana.

It was further revealed that Employee's crew had not repaired pull aparts for a week prior to the alleged fall and that those repairs occurred approximately one-half mile from the site of Employee's alleged injury. Furthermore, the truck Employee allegedly slipped on had not stored diesel since the last repair. Supervisor Hendricks went to the work site a couple of hours after Employee informed him of the alleged fall. He found no diesel fuel on the truck running board or on the ground in the vicinity. He even ran his finger along the running board. It was not slick like oil nor did it give off the distinctive odor of diesel. Supervisor Hendricks also testified that he specifically asked Employee during their telephone conversation shortly after the alleged fall whether the running board or door handle were wet, dirty or greasy. Employee responded, "there wasn't anything that he would know that would cause him to slip."

■ Employee's first point on appeal asserts the trial court erred in "prohibiting" him from introducing into evidence the depositions of supervisors Johnson and Hendricks. During his case-in-chief, Employee attempted to read into the record the entire depositions of Johnson and Hendricks. In opposition to Employer's objection, Employee contended that those depositions were admissible as admissions against interest and under Rule 57.07(a)(2) which allows the depositions of officers, directors and managing agents to be admitted for any purpose. Both Johnson and Hendricks were available to testify, and the court ruled that Employee may read into the record during his case-in-chief only those portions of the deposition that were against interest. The remaining portions could be used in cross-examining the

witnesses. Employee chose not to introduce any portion during his case-in-chief, nor did he make an offer of proof of those portions he desired to introduce.

The argument contained in Employee's brief limits his complaint to those portions of the depositions that rebutted Employer's opening argument that Employee had no reason to return to his work site following his Kansas City drug test. Johnson's deposition included Johnson's admission that he directed Employee to return to Orrick, and Hendricks' deposition stated it was permissible for Employee to return to the Orrick work site to clean. We have examined the trial transcript. The court never ruled to exclude the complained of portions of the depositions. During Employee's case-in-chief, Employee was permitted to introduce those portions that were against interest. Employee has vigorously argued that the complained of portions were against interest; yet, he made no effort to admit those portions. The decision not to attempt to introduce those portions was voluntary. As the court noted of Employee's counsel, "That's a decision you're making individually...." There is no ruling of the trial court for us to review. Point denied.[1]

■ In his second point, Employee asserts the trial court erred by admitting evidence of Employee's drug test results. "Admission or exclusion of evidence lies within the sound discretion of the trial court. We will not reverse a decision unless there is a substantial or glaring injustice." *First Nat. Bank v. Kansas City So. Ry.*, 865 S.W.2d 719, 739 (Mo.App.W.D.1993). Evidence of a witness' or party's drug use presents a great risk of creating undue prejudice. Thus, as a

general rule, such evidence is inadmissible unless it is clearly relevant and its probative value out-weighs the recognized risk of undue prejudice. *See, e.g., Id.; Doisy v. Edwards*, 398 S.W.2d 846, 849–50 (Mo.1966).

Here, the drug test result evidence was relevant and highly probative of the Employee's motivation to fabricate his injury. The evidence showed that Employee was aware that a positive result on a drug test exposed him to dismissal from his job. It further showed he was nervous and agitated when requested to submit to drug testing. His first urine sample was rejected for coolness. The positive test results enforce the inference that Employee was aware that dismissal may be forthcoming and that he fabricated his injury in anticipation of this dismissal. Although extreme caution must be exercised in admitting drug-use evidence, we find no abuse of discretion under these circumstances.[2]

■ Furthermore, we find no abuse of discretion by the trial court in admitting the test results for lack of foundation. Employee argues that Employer failed to provide sufficient evidence of the chain of custody of Employee's urine sample. "While the law does not require proof of every hand-to-hand transfer of evidence, the chain of custody must be sufficiently traced so that there is reasonable assurance that the item offered has not been substituted for the original item that was seized, or that the substance has not been contaminated or tampered with." *State v. Weber*, 768 S.W.2d 645, 648 (Mo.App.1989).

■ Here, the collectors of the urine samples as well as Employee attested by signature that the specimens had been drawn, collected, labeled and placed in a tamper-

---

1. We note that the court expressly ruled the depositions could be used during the cross-examinations of the deponents. During cross-examination, Employee did in fact elicit the information concerning Employee's return to Orrick. Even if we had an erroneous ruling to review, the prejudice would have been minimal and would not have constituted reversible error.

2. Employee cites several cases requiring evidence that drug use actually affected the party in a substantial way before evidence of drug use may be admitted. *See First National*, 865 S.W.2d at 739 (evidence of drug use not admissi-

ble to show lessened life expectancy without a showing that drug use actually affected the plaintiff's life expectancy); *Simpson v. Smith*, 771 S.W.2d 368, 370 (Mo.App.1989) (evidence of drug use not admissible to show defendant driving in a negligent manner without a showing that the defendant was driving erratically at the time of the accident). Here, however, the drug test evidence was not used to show employee fell because he was under the influence of the drug. Under these circumstances, the probative value of the test results out-weighed the risk of prejudice to employee.

evident bag. The laboratory employees who received the samples signed a form indicating the samples were received with the tamper-evident bag sealed. We find such evidence sufficient to support the trial court's conclusion that a sufficient chain of custody was established. *Compare, State, Div. of Family Serv. v. Williams*, 861 S.W.2d 592, 594 (Mo.App.E.D.1993). Similarly, the deposition of the technical manager of the laboratory, Ben R. Wells, was sufficient to lay a foundation for the testing methods employed and the qualifications of the testers and result interpreters. Point denied.

■ In his third point, Employee asserts the trial court erred in not allowing him to impeach Dr. John Fries with "Innominate Shear Dysfunction in the Sacroiliac Syndrome," an article by Dr. Phil Greenman published in the *Journal of Manual Medicine*. Dr. John Fries testified that there was no medically recognized condition or diagnosis known as sacral shear or sacral instability. This testimony was in direct contradiction with the testimony of Employee's medical expert, Dr. Larry Bader, who stated Employee had suffered sacral shear as result of his fall. An objection to prohibit Employee from impeaching Dr. Fries with the journal treatise was sustained.

■ The scope and extent of cross-examination in a civil trial is determined at the discretion of the trial court, and its ruling will not be disturbed except where a clear abuse of discretion is shown. *Crain v. Newt Wakeman, M.D., Inc.*, 800 S.W.2d 105, 107 (Mo.App.1990). It is proper to cross-examine a medical expert with medical textbooks and treatises where there is evidence that the text or treatise so employed is authoritative. *Id.* To be authoritative, there must be some evidence of general acceptance and accreditation of the text or treatise within the profession. *Id.* "Evidence of the authoritative nature of the text or treatise may be (a) conceded by the witness himself, or (b) established by judicial notice, or (c) established by other experts in the field." *Id.*

■ Articles from periodic journals are inherently conferred less trustworthiness and reliability than texts used in the practice and teaching of medicine. *Grippe v. Momtazei*, 705 S.W.2d 551, 556–557 (Mo.App.1986). Texts are subject to greater scrutiny from the profession and are written with less partisanship and bias to differing medical opinions. *Id.* at 557.

Similar considerations do not necessarily attach to articles in periodicals and journals, ... Many of the articles published in such journals are mere expressions of the authors' opinions on controversial subjects ... Many of the published articles relate to experimentation and speculation based upon preliminary studies and are intended to invoke comment and criticism. Mere inclusion of an article in a journal, no matter how prestigious the journal may be, does not confer acceptance and accreditation of the opinions expressed by the author.

*Id.*

Dr. Fries explained that he had researched "sacral shear" and "sacral instability" but was unable to find any material discussing this alleged condition. Dr. Fries was not familiar with either Dr. Greenman or the article. He was unable to concede the authoritativeness of the article.

Employee argues Dr. Bader had sufficiently laid the foundation for the article's authoritativeness in his deposition. During his deposition, Dr. Bader was asked if he "could tell [ ] what textbooks or authorities have *descriptions* of [sacral shear]" (Emphasis added). Dr. Bader responded:

A. Dr. Phil Greenman's—any of the *books* he has written out of the Michigan State School.... It is a common joint problem that's referred to in every teaching text in osteopathic medicine.

Q. All right. Dr. Phil Greeman [sic] whom you mentioned, do you happen to know the name of his *text*, Doctor?

A. I don't.

Q. Is it a *textbook* in osteopathic—

A. Yes, it's an osteopathic—

Q. —medicine.

A. —medicine *textbooks*.

Q. Okay. Are all these texts that you referred to osteopathic *texts?*

A. That's correct. (Emphasis added).

We find no error in the trial court's conclusion that the foundation of the treatise's authoritativeness and accreditation was not made. Dr. Bader mentioned Dr. Greenman only as an author who has described sacral shear. The descriptions Dr. Bader was familiar with were contained in textbooks. Dr. Bader gave no indication that he was even aware of Dr. Greenman's journal article nor did he provide any evidence of that article's acceptance and accreditation in the medical profession. Point denied.

■ In his fourth point, Employee asserts the trial court erred in refusing his assumption of the risk withdrawal instruction. Employee tendered an instruction based on MAI 34.04 which read:

[Employee] does not assume any of the risks of his employment. This matter is withdrawn from the case and you are not to consider such evidence in arriving at your verdict.

Employee argues that this instruction was necessitated by Employer injecting the issue of assumption of the risk during the following portion of its cross-examination of Employee:

Q. And you're not telling this jury that you saw diesel fuel sliding all around in the bed of the truck without doing something, are you, sir?

A. Actually, it would be the foreman's responsibility to do something about it.

Q. When you were doing this job, sir?

A. Yes, sir, for the foreman was there doing the job also.

Q. Wouldn't it also be your job to do any cleaning up of spilling of oil?

A. If I was told so.

Q. And you would try to keep your workplace as clean as possible?

A. Yes, sir.

■ The withdrawal instruction is intended to avoid misleading and confusing the jury because of some spurious issue raised during the course of the trial. *Weisbach v. Vargas,* 656 S.W.2d 797, 799 (Mo.App.1983).

The Notes on Use for MAI 34.04 explain "This instruction may only be given if the false issue of assumption of the risk is injected in the case." Where an assumption of the risk issue is falsely injected in the case, the trial court is vested with discretion in giving the withdrawal instruction in light of the reasonable likelihood that the jury would be in any way confused or misled by the false issue raised. *Id.* at 799–800.

■ Here, the trial court ruled that the withdrawal instruction was inappropriate because the issue of assumption of the risk was not injected as an issue in the case.[3] We find no error in this ruling. Employee testified that his slip was caused by the presence of spilled diesel fuel at the work site. The portion of the cross-examination quoted above may properly be construed as an attempt to impeach Employee's contention that diesel fuel was present at the work site. Such an inquiry is appropriate and does not necessarily implicate assumption of the risk. Employer did not plead assumption of the risk, nor did it argue that defense in either its opening or closing statements. The trial court could properly conclude that the jury could not reasonably be mislead or confused by the cross-examination into believing Employee had assumed the risk. *See, also, Clark v. Burlington Northern, Inc.,* 726 F.2d 448, 451–52 (1984) (noting that where assumption of the risk is neither argued nor plead in a FELA case, *giving* an assumption of the risk withdrawal instruction may be confusing and misleading to a jury). Point denied.

■ Employee asserts in his fifth point that the trial court erred in denying his pre-existing condition instruction. Essentially, Employee requested that the damage instruction include language clarifying that damage caused by aggravation of a pre-existing injury may be considered. However, assuming *arguendo* it was error to deny the instruction, no harm could have arisen from it. The jury found that Employer was not liable to Employee. Therefore, assessment of damages was not reached by the jury. The risk of harm from an erroneous damage

---

**3.** Both parties concede that assumption of the risk is not a defense to a FELA action. *See Tiller v. Atlantic Coast Line Railway Company,* 318 U.S. 54, 58, 63 S.Ct. 444, 446–47, 87 L.Ed. 610, 612–13 (1943).

instruction was never realized. *See Ins. Co. of N. Am. v. Skyway Aviation,* 828 S.W.2d 888, 894 (Mo.App.1992) ("Any error in instructing on damages constitutes harmless error when the jury finds no liability on the substantive claim.") Point denied.

 In his sixth point, Employee asserts that he was denied a fair trial because Employer failed to produce a report made by supervisor Grant Hendricks. On July 16, 1990, Employee made a discovery request of Employer asking, *inter alia,* for "any and all statements obtained from the plaintiff concerning the facts of this lawsuit." In response, Employer's production included two statements of Employee transcribed in supervisor Hendricks' disputed report. However, Employer claimed the report was otherwise protected by the work product and attorney-client privilege. In the nearly four years between Employer's claim of privilege and the trial, Employee never sought to dispute the claim of privilege.

At trial, Employee's counsel asked supervisor Hendricks on cross-examination if he had heard Employee's trial description of the alleged circumstances of his injury and if that description was consistent with the description Employee gave contemporaneously with the alleged injury. Supervisor Hendricks said that the court description was the same except Employee had originally said he approached the truck from the side rather than his in-court statement of the rear. Supervisor Hendricks stated that he was aware of this minor discrepancy based on his review of the privileged report. Employee's counsel objected asserting that the report was not produced. The court concluded:

Well, apparently counsel for [Employer] didn't know of it either if he had some kind of a little notation. I don't know what he's [Hendricks] referencing, but it would either be if it were prepared and offered to the attorney, it was either in preparation for the litigation or as part of the composition of a report he must have filed in relation to the events. I don't know either but it sounds like it has to be privileged. It's something that's made after the reported injury in anticipation of litigation or as part of his duties as a track supervisor to memorialize this information. And whether he gave it to his attorney then for

litigation purposes, I don't know, but it's either privileged or it's work product, it has to be either one of those things.

Our standard of review on this issue is concisely set out in *State ex rel. Lichtor v. Clark,* 845 S.W.2d 55 (Mo.App.W.D.1992):

The trial court is allowed broad discretion in the control and management of discovery. It is only for an abuse of discretion amounting to an injustice that the appellate courts will interfere. A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.

*Id.* at 59 (citations and quotation marks omitted).

Employee argues that the trial court abused its discretion because the report was a party statement as described in Rule 56.01(b)(1):

\* \* \*

A party may obtain without the required [substantial need] showing a statement concerning the action or its subject matter previously made by that party. For purposes of this paragraph, a statement previously made is: (a) a written statement signed or otherwise adopted or approved by the person making it, or (b) a stenographic, mechanical, electrical, audio, video, motion picture or other recording, or a transcription thereof, of the party or of a statement made by the party and contemporaneously recorded.

We are unpersuaded by Employee's attempt to characterize the report under this rule. Employer appeared to attempt to comply with this rule by producing two statements of Employee contained in the report. There is no indication in the record that the remaining portions of the report were other than Hendricks' recollection or interpretation of Employee's conversation with him. There is no indication that the report contained any other statement precisely or exactly recorded or transcribed as contemplated by this rule. Employee cites no authority that persuades us otherwise. Furthermore, we are unconvinced Employee was prejudiced. Except for the relatively immaterial matter

of which direction he approached the truck, Hendricks' report-aided testimony confirmed Employee's testimony was consistent with Employee's description at the time of the alleged injury. Furthermore, Employee was informed of the existence of the report and Employer's claim of privilege. Employee had nearly four years prior to trial to challenge its privileged status. We find no abuse of discretion by the trial court. Point denied.

 Finally, in his seventh point, Employee asserts the trial court committed reversible error by not permitting him to play, during Employee's case-in-chief, a surveillance video recorded by Employer. Prior to trial, Employer taped Employee at his new racetrack job. The tape consisted of approximately one hour and fifteen minutes of a three-hour period of work. Employee was aware Employer intended to present an edited twenty-five minute portion of the tape. During Employee's counsel's examination of Employee, his counsel asked to play the entire tape explaining, "It's a day in the life of the [Employee] at work." The trial court did not allow Employee to play the tape. The entire tape was subsequently played before the jury during Employer's case-in-chief. On appeal, Employee claims the tapes should have been admitted during his case-in-chief because the tapes were relevant to show the extent of Employee's injuries and to bolster Employee's credibility.

While "Day–In–The–Life" videotapes may indeed be relevant to a plaintiff's case, Missouri law permits a trial judge to limit admission:

> The issue presented in admitting or rejecting a "Day–In–The–Life" videotape is whether it is practical, instructive and calculated to assist the jury in understanding the case. The trial court's ruling regarding the admissibility of such videotapes is accorded great weight and will not be disturbed on appeal absent an abuse of discretion.

*Repple v. Barnes Hosp.*, 778 S.W.2d 819, 822 (Mo.App.1989) (citations omitted). Where a plaintiff is present to testify and the extent of plaintiff's injury could be described or demonstrated, cases have held it was not an abuse of discretion to deny the plaintiff the playing of a "Day–In–The–Life" video. *See, e.g. Id.* at 822–23; *Helm v. Wismar*, 820 S.W.2d 495, 497 (Mo. banc 1991); *Haley v. Byers Transportation Co.*, 414 S.W.2d 777, 780 (Mo.1967). We similarly find no abuse of discretion here.

Judgment affirmed.

CRAHAN, P.J., and CRANDALL, J., concur.