**Phillip R. BARKER, as Administrator of the Estate of Brenda Lynn Barker, deceased, Phillip R. Barker, individually, Mindy Billington, and Angie Pace, Plaintiffs–Appellants,**

v.

**Kimberly A. SCHISLER, D.O., Defendant–Respondent.**

No. SD 29003.

Missouri Court of Appeals, Southern District, Division One.

Jan. 3, 2011.

---

John Womick, Ralph R. Bloodworth, III, Herrin, IL, for Appellants.

Ted R. Osburn, Cape Girardeau, MO, for Respondent.

JEFFREY W. BATES, Presiding Judge.

Phillip Barker, Mindy Billington and Angie Pace (hereinafter referred to individu-ally by their first names and collectively as Plaintiffs) brought a wrongful death action against Dr. Kimberly Schisler (Dr. Schisler) to recover damages resulting from the death of Brenda Barker (Barker), Phillip's wife and mother of Mindy and Angie.[1] The wrongful death claim was tried to a jury, which returned a verdict in favor of Dr. Schisler. This appeal followed. Plaintiffs contend the trial court made three erroneous evidentiary rulings that warrant reversal. Finding no merit in these contentions, we affirm the trial court's judgment.

An appellate court views the facts in the light most favorable to the jury's verdict. *Mengwasser v. Anthony Kempker Trucking, Inc.*, 312 S.W.3d 368, 370 n. 1 (Mo. App.2010); *Berra v. Danter*, 299 S.W.3d 690, 694 (Mo.App.2009). So viewed, the following evidence was presented at trial.

Dr. Schisler is a family practice physician with an office in Poplar Bluff, Missouri. In 2000, Barker became one of Dr. Schisler's patients. Between 2000 and 2003, Dr. Schisler had seen Barker approximately 32 times for health issues like anemia, blood pressure problems, routine upper respiratory infections, etc. In July 2003, Dr. Schisler gave Barker a nonrefill-able prescription for 60 Lorcet tablets for low back pain. This medication, which is used for pain relief and fever reduction, is a combination of acetaminophen and the opioid narcotic hydrocodone.

On the morning of December 31, 2003, Barker called and obtained an appointment to see Dr. Schisler. Barker and Phillip went to Dr. Schisler's office. Dr. Schisler took a history from Barker. She

---

1. Phillip also brought a claim for lost chance of survival in his capacity as the administrator of Barker's estate. At the close of Plaintiffs' evidence, the trial court directed a verdict against administrator Phillip on the lost chance of survival claim. Further discussion of this claim is unnecessary because the directed verdict ruling has not been challenged on appeal.

said "she just felt bad." She had body aches, and her temperature at home was 103°. She also reported pain in her right lower rib area. She had reported the same type of pain during past office visits. Barker said she had been absolutely fine the prior day. Dr. Schisler observed that Barker looked the same as she had on prior occasions. She did not appear clinically short of breath. The abrupt onset of symptoms and the fact that it was flu season led Dr. Schisler to suspect Barker had influenza. During Barker's physical examination, Dr. Schisler listened to Barker's lungs. Dr. Schisler did not hear any sounds of crackles, wheezes or rattles, which are present when a patient has pneumonia. Barker did not appear to need immediate hospitalization.

Dr. Schisler ordered a chest x-ray because Barker was complaining of pain in her right lower rib area. This condition was causing Barker a lot of pain. After the technicians took the x-ray (the 12–31–03 film), Dr. Schisler examined it to make sure the radiologist had a good film to read. She expected to get the radiologist's report in due course. She did not ask that the report be expedited so it would be ready within 24 hours. Dr. Schisler diagnosed Barker with influenza. Barker was given a prescription for Tamiflu, which is an antiviral medication specifically for influenza. Dr. Schisler also gave Barker a shot of Toradol, which was an anti-inflammatory medication to help with muscle and body aches. Dr. Schisler told Barker to call if she was not better in 24 hours.

At the appointment, Barker also said she was out of Lorcet and asked for a refill. Dr. Schisler gave Barker a prescription for 60 Lorcet tablets to treat her back pain. The prescription stated Barker should take one tablet every six hours as needed. Dr. Schisler advised Barker that the Lorcet was just for her chronic low back pain and should not be taken while she had the flu. Dr. Schisler gave that instruction because Lorcet could affect Barker's respiratory system, which was already affected by the flu. Phillip did not hear Dr. Schisler's instruction to Barker about not taking the Lorcet.

Barker returned home with Phillip and arrived between 12:30 and 1:00 p.m. Phillip then took the prescriptions to a Kroger pharmacy, had them filled and returned home. Barker immediately began to take both medications. Phillip was actively involved in giving Barker these medications. He recalled that one of the prescription medications was supposed to be taken every six hours, according to the label. Phillip testified that, if Barker was hurting, she may have taken more than the prescribed amount of medication to relieve the pain.

Over the next 24 hours, Barker's symptoms did not improve. She did not call Dr. Schisler. Sometime after 11:00 p.m. on January 1st, Barker told Phillip that she was getting worse. She decided to wait until morning to call the doctor. Sometime between 2:00 and 4:00 a.m. on January 2nd, Barker died. Thereafter, the 12–31–03 film was read by a radiologist. The report stated that: (1) the x-ray revealed a vague opacity in the upper right lobe; (2) pneumonia and malignancy were considerations; and (3) clinical correlation was advised.

Detective Gary Pride of the Poplar Bluff Police Department and Butler County Coroner Larry Cotrell (Coroner Cotrell) went to Barker's home to investigate her death. As part of the investigation, police collected all of the prescription medication that Barker had been taking before she died. One medication box contained Tamiflu. The label showed that: (1) this prescription had been filled at the Kroger pharmacy on 12–31–03; (2) the quantity of

capsules was 10; and (3) the directions were to take one capsule by mouth twice a day. There were six capsules remaining in the box. Another bottle contained a prescription for Lorcet. The label showed that: (1) this prescription had been filled at the Kroger pharmacy on 12–31–03; (2) the quantity of tablets was 60; and (3) the directions were to take one tablet by mouth every six hours as needed. There were 40 tablets remaining in the bottle. Coroner Cotrell arranged for an autopsy to be performed.

Dr. Russell Deidiker (Dr. Deidiker), a pathologist at Mineral Area Regional Medical Center in Farmington, performed Barker's autopsy. Dr. Deidiker concluded that the cause of death was bilateral bacterial pneumonia. As part of the autopsy, samples of Barker's blood were sent to a toxicology laboratory in St. Louis. The toxicology report was positive for opiates. Dr. Deidiker's autopsy report did not discuss the results of the toxicology tests. Based upon the autopsy report, Coroner Cotrell later issued a death certificate listing Barker's cause of death as acute bronchial pneumonia.

In January 2005, Plaintiffs filed suit against Dr. Schisler. The petition alleged that Dr. Schisler had been negligent in failing to diagnose and treat Barker's pneumonia. The case was tried to a jury, which returned a verdict for Dr. Schisler. Plaintiffs present three evidentiary issues for decision.[2] The relevant facts will be presented in connection with our discussion of each point.

### Point II

■ Plaintiffs' second point contends the trial court erred by not permitting them to use a publication during the cross-examination of Dr. Schisler and her expert, Dr. Gary Salzman (Dr. Salzman). This point arises from the following facts.

Dr. Steven Sahn (Dr. Sahn) was one of the Plaintiffs' expert physician witnesses. During his direct examination, he testified that several groups had generated guidelines for diagnosing and treating pneumonia. The American Thoracic Society (ATS) was one such group. Dr. Sahn testified that the ATS guidelines described the standard of care. With respect to the treatment of a specific patient, however, Dr. Sahn acknowledged that "the guidelines are just guidelines. You have to use your clinical judgment." Dr. Sahn did not testify that he believed the ATS guidelines were generally accepted and regarded as authoritative within the medical profession.

Dr. Salzman was one of Dr. Schisler's expert physician witnesses. During cross-examination, he testified that he was familiar with the ATS guidelines. At a later point in his cross-examination, he was asked if he disagreed with the ATS guidelines. Defense counsel objected that there had been no foundation laid for the use of this publication because no one had established that it was authoritative. The trial court agreed. Dr. Salzman then testified that the ATS guidelines provided "guidance to the standard of care," but they were not authoritative. In fact, Dr. Salzman disagreed with most of what the guidelines said. Plaintiffs' counsel then asked if Dr. Salzman would ignore the ATS standards in treating patients. Defense counsel objected that no one had yet testified that the ATS guidelines were au-

---

2. Plaintiffs' first point states: "The standard of review for questions of law is *de novo* while questions regarding the admissibility of evidence in this case is an abuse of discretion standard." This abstract statement of law does not state what trial court ruling is challenged, and the argument discusses only the applicable standard of review. Accordingly, Point I is denied. *See McDonald v. McDonald*, 946 S.W.2d 743, 745 (Mo.App.1997).

thoritative and that Plaintiffs' counsel was not phrasing his questions in the exact language used in the guidelines. The trial court agreed and sustained the objection. Plaintiffs' counsel did not make an offer of proof.

During Dr. Schisler's cross-examination, she testified that she was aware of the ATS guidelines. They were among several different guidelines used by physicians. Dr. Schisler had not read the ATS guidelines for a long time, so she was not sure whether or not she agreed with everything in them. After Plaintiffs' counsel had the guidelines marked as Plaintiffs' Ex. 25, defense counsel objected that no one had laid the foundation that the exhibit was authoritative. At the request of Plaintiffs' counsel, Dr. Schisler briefly and silently reviewed the exhibit. During the review process, Plaintiffs' counsel asked Dr. Schisler to look at several pages in the exhibit. The record contains no information about what was on those pages. Dr. Schisler testified that the ATS guidelines were not authoritative. Plaintiffs' counsel then asked the witness, "You've read some of the things I suggested to you. Do you see anything in there that you disagree with?" Defense counsel objected that this was an improper question and that no foundation had been laid to use the document. The trial court sustained the objection. Plaintiffs' counsel did not make an offer of proof.

Plaintiffs contend that the trial court erred by not permitting Dr. Salzman or Dr. Schisler to be cross-examined about the ATS guidelines. Plaintiffs argue that the trial court used the wrong legal standard in determining whether the ATS guidelines could be used during cross-examination. We disagree.

■ We review the trial court's ruling on the scope and extent of cross-examination for abuse of discretion. *Embree v.*

*Norfolk & Western Ry. Co.*, 907 S.W.2d 319, 325 (Mo.App.1995). In order to use written material to cross-examine an expert, the propounding party must establish that said material is generally accepted and regarded as authoritative within the profession. *Herrera v. DiMayuga,* 904 S.W.2d 490, 494 (Mo.App.1995). The witness' mere familiarity with the text is not sufficient. *State v. Love,* 963 S.W.2d 236, 245 (Mo.App.1997). The propounding party may establish that written material is authoritative through his own expert outside the hearing of the jury or during cross-examination of the opposing expert. *Herrera,* 904 S.W.2d at 494. Once this prerequisite is met, counsel may cross-examine the opposing expert by framing a proposition in the exact language of the text or treatise and asking the witness whether he or she agrees with it. *Foster v. Barnes–Jewish Hosp.,* 44 S.W.3d 432, 438 (Mo.App.2001).

Plaintiffs argue that Dr. Sahn's testimony provided a sufficient foundation for later use of the ATS guidelines in the cross-examination of Dr. Salzman and Dr. Schisler. We find that argument unpersuasive. While Dr. Sahn was familiar with the ATS guidelines, he did not testify that this publication was generally accepted and regarded as authoritative in the medical profession. *Embree,* 907 S.W.2d at 326. Indeed, Dr. Sahn conceded that the ATS guidelines "are just guidelines. You have to use your clinical judgment." Plaintiffs have cited no case, and this Court is aware of none, holding that testimony like that given by Dr. Sahn is sufficient to establish the authoritativeness of medical literature for use in cross-examination.

Given the state of the record when Plaintiffs' counsel sought to cross-examine Dr. Salzman about the ATS guidelines, it was necessary for the witness to first acknowledge the authoritativeness of the

publication. *Gridley v. Johnson*, 476 S.W.2d 475, 481 (Mo.1972); *Herrera*, 904 S.W.2d at 494.[3] Because Dr. Salzman did not do so, the trial court correctly sustained defense counsel's objection. *See Coats v. Hickman*, 11 S.W.3d 798, 804 (Mo.App.1999). The same rationale applies to the trial court's decision to sustain the objection to questions about the ATS guidelines posed to Dr. Schisler. When that line of questioning commenced, no expert witness had testified that the ATS guidelines were authoritative. Because Dr. Schisler did not do so, the trial court's ruling was correct. *Id.*

We also note that Plaintiffs' counsel never used the proper format to question either Dr. Salzman or Dr. Schisler. None of the questions framed a proposition in the exact language of the author and then asked the witness whether he or she agreed with it. Because the proper procedure was not followed, the trial court's evidentiary rulings were correct for this reason as well. *See Foster*, 44 S.W.3d at 438–39.

■ Finally, we note that Plaintiffs' counsel made no offer of proof when the objections to his proposed cross-examination of Dr. Salzman and Dr. Schisler were sustained. Without a specific offer of proof, appellate courts generally do not review the question of excluded evidence. *Noel v. Noel*, 278 S.W.3d 217, 225 (Mo. App.2009). The lack of an offer of proof precludes Plaintiffs from demonstrating on appeal that the trial court improperly excluded any relevant and material evidence. *See English v. Empire Dist. Elec. Co., Inc.*, 220 S.W.3d 849, 854 (Mo.App.2007); *Crain v. Newt Wakeman, M.D., Inc.*, 800 S.W.2d 105, 108 (Mo.App.1990). Point II is denied.

### Point III

■ Plaintiffs' third point contends the trial court erred by admitting testimony from Dr. Henry Simmons (Dr. Simmons), a medical expert retained by Dr. Schisler, concerning Barker's use of Lorcet prior to her death. This point arises from the following facts.

Prior to trial, Plaintiffs filed a motion in limine concerning Dr. Simmons' testimony. The motion asserted that Dr. Simmons had utilized a "volume of distribution" method in calculating the amount of opiates in Barker's blood when she died. The suggestions in support of the motion argued that, based upon § 490.065.3, Dr. Simmons' opinion should be excluded because this volume of distribution method was not reasonably relied upon by experts in his field.[4] During a pretrial hearing, the trial court denied the motion.

During the Plaintiffs' case-in-chief, they called Dr. Deidiker as a witness. He gave the following testimony. As a part of the autopsy, samples of Barker's blood were sent to a toxicology laboratory in St. Louis. The analysis was performed by lab director Christopher Long (Long). The toxicology report was positive for opiates. The level of hydrocodone was .17 micro-

---

**3.** The authoritativeness of the ATS guidelines was not established by judicial notice, which is the only other way a foundation for use of that publication in cross-examination could be laid. *See Crain v. Newt Wakeman, M.D., Inc.*, 800 S.W.2d 105, 107 (Mo.App.1990).

**4.** References to § 490.065 are to RSMo (2000). Section 490.065.3 specifically provides:

The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

grams per milliliter. Dr. Deidiker talked to Long about that result. Long said that, if there was another explanation for Barker's death, Dr. Deidiker should not worry about the hydrocodone level. That was consistent with what Dr. Deidiker had read in medical literature. Where there was no other explanation for the cause of death, hydrocodone levels of .12 or .13 micrograms per milliliter had been described as fatal. In other situations, persons who had been pulled over for erratic driving had hydrocodone levels as high as .19 micrograms per milliliter. Based upon the conversation with Long and other information gleaned during the autopsy, Dr. Deidiker concluded that Barker's hydrocodone level was not relevant to her cause of death. Dr. Deidiker's autopsy report did not discuss the toxicology results. Plaintiffs also presented testimony from Coroner Cotrell. Based upon Dr. Deidiker's autopsy report, Coroner Cotrell issued a death certificate listing Barker's cause of death as acute bronchial pneumonia.

During Dr. Schisler's case-in-chief, she called Dr. Simmons as a witness. He was an M.D. physician licensed in Arkansas, and he served as the medical director for the poison center at the University of Arkansas. He also taught courses in toxicology and emergency medicine. He had a bachelor's degree in chemistry and a Ph.D. in interdisciplinary toxicology. After graduating from medical school, he did a two-year residency in family medicine. He also had two years of experience working in emergency medicine. He had board certifications in family medicine, emergency medicine and toxicology.

During Dr. Simmons' direct examination, he testified that Dr. Schisler's treatment of Barker met the applicable standard of care. Dr. Simmons also was asked to give his opinion on the cause of Barker's death. Plaintiffs' counsel objected "as to foundation." During a bench conference, Plaintiffs' counsel stated that, if Dr. Simmons based his opinion on the volume of distribution method, Plaintiffs objected because that method was not accepted in the scientific community. The trial court ruled that Dr. Schisler's counsel should "[g]o a little further into the credentials and what [the witness] did first[.]" Dr. Schisler's counsel did so at some length.

Dr. Simmons testified that his past work experience included the review of toxicology reports to analyze causation. He reviewed toxicology reports a number of times each year when looking at autopsy data. Barker's toxicology report showed .17 micrograms of the opiate hydrocodone (Lorcet) in her blood. Dr. Simmons was familiar with opiates because he had prescribed these drugs for 15 years and had taught about them four times each year for 15 years. At a high enough dose, an opiate can profoundly depress the central nervous system so that a person stops breathing and dies from lack of oxygen. The effect of hydrocodone on a person is dependent on such things as the dosage taken, whether the person had developed a tolerance to the drug, etc. When Dr. Simmons was asked if Barker was tolerant to opioids on December 31, 2003, Plaintiffs' counsel objected to "[f]oundation." The court overruled the objection. Dr. Simmons testified that Barker was not opioid tolerant. Dr. Simmons testified that the .17 micrograms of hydrocodone in Barker's blood was within the range that had been associated with death. Dr. Simmons was asked to assume that Barker, who was five feet, ten inches tall and weighed 350 pounds, took 20 Lorcet tablets during the 40–hour time period between noon on December 31st and her death on January 2nd. By approximately 4:00 a.m. on January 2nd, Dr. Simmons opined that the hydrocodone would have reduced Barker's ability to breathe. In combination with

the reduction in blood-oxygen levels caused by the pneumonia, he testified that the hydrocodone level could have caused Barker to die suddenly. Dr. Simmons would not have expected the same result if Barker had taken only the prescribed amount of hydrocodone. During the foregoing portions of Dr. Simmons' testimony, Plaintiffs' counsel repeatedly made the same "foundation" objection, which was overruled by the trial court. At the conclusion of Dr. Simmons' direct examination, he was asked to give an opinion as to Barker's cause of death. The "foundation" objection asserted by Plaintiffs' counsel was overruled. Dr. Simmons testified that Barker died from complications of opioid toxicity in combination with her developing pneumonia. Dr. Simmons opined that the hydrocodone in Barker's system impaired her respiration and ability to cough to clear secretions.

During cross-examination, Dr. Simmons testified that he had not used or relied upon the volume of distribution calculation in forming his opinions. His opinions were based upon the clinical scenario, the fact that Barker's hydrocodone level was within the range associated with fatality and the fact that Barker was not opioid tolerant. After recross-examination was completed, Dr. Simmons was excused. The court then took a short recess. When the trial reconvened, Plaintiffs' counsel moved to strike all of Dr. Simmons' testimony on the grounds that he did not have proper qualifications and his opinions had changed since he was deposed. That request was denied.

Plaintiffs contend that the trial court erred by permitting Dr. Simmons to testify about Barker's opiate use and cause of death. Plaintiffs argue that Dr. Simmons' testimony was not based upon proper foundation and was not reasonably reliable, all in violation of § 495.065.3. Plaintiffs also argue that Dr. Simmons' opinions should have been stricken because he did not know what Barker's actual cause of death was.

Neither of the foregoing arguments is preserved for appeal. The only time that Plaintiffs specifically challenged Dr. Simmons' testimony as not being in compliance with § 490.065.3 was in their motion in limine seeking to prohibit the doctor from testifying about the volume of distribution method of calculating blood opiate levels. The motion in limine preserved nothing for appellate review. See Ratcliff v. Sprint Missouri, Inc., 261 S.W.3d 534, 551 (Mo.App.2008). At trial, Plaintiffs reasserted that objection only to the extent Dr. Simmons relied upon the volume of distribution calculation. The witness testified several times that he did not do so. His opinions were based upon the clinical scenario, the fact that Barker's hydrocodone level was within the range associated with fatality and the fact that Barker was not opioid tolerant. Plaintiffs' "foundation" objections to other aspects of Dr. Simmons' testimony were general and preserved nothing for appellate review. See Thompson v. Rockett, 313 S.W.3d 175, 181 (Mo.App.2010); Catroppa v. Metal Bldg. Supply, Inc., 267 S.W.3d 812, 816–17 (Mo.App.2008). Because Plaintiffs did not specifically rely upon § 490.065.3 as the basis for the objections to Dr. Simmons' testimony, this foundational argument was waived and cannot be considered. See Rinehart v. Shelter General Ins. Co., 261 S.W.3d 583, 592 (Mo.App.2008); Peters v. General Motors Corp., 200 S.W.3d 1, 15–16 (Mo.App.2006). Similarly, Plaintiffs moved at trial to strike all of Dr. Simmons' testimony on the two grounds noted above. On appeal, Plaintiffs advance a different

argument that was not presented below.[5] The grounds advanced on appeal are limited to those stated at trial. *Rinehart*, 261 S.W.3d at 592. Therefore, we cannot consider Plaintiffs' new argument asserted for the first time on appeal. *State ex rel. Selby v. Day*, 929 S.W.2d 286, 288 (Mo. App.1996). Point III is denied.

## Point IV

■ Plaintiffs' fourth point contends the trial court erred in not permitting lab director Long to testify that Barker's opiate use could not have been the cause of her death. This point arises from the following facts.

Long was not a physician. He had a bachelor's degree in chemistry, a master's degree in medical biology and a Ph.D. in toxicology. During Long's direct examination, he was asked to give his opinion on whether the drugs in Barker's blood had any effect on causing her death. Defense counsel objected on the ground that the question called for a medical opinion Long was not qualified to give. The trial court sustained the objection. During an offer of proof, Long gave the following testimony:

Q And in this case, in your opinion to a reasonable degree of medical certainty as a toxicologist, did any of the drugs individually or collectively cause this patient's death?

A No.

After hearing the offer of proof, the trial court adhered to its earlier ruling and excluded this evidence. Plaintiffs argue that the trial court's ruling was erroneous. We disagree.

■ We review the exclusion of evidence for abuse of discretion. *Sparkman v. Columbia Mut. Ins. Co.*, 271 S.W.3d 619, 622–23 (Mo.App.2008). A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before it, and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration. *Oldaker v. Peters*, 817 S.W.2d 245, 250 (Mo. banc 1991). We find no such abuse of discretion here. In *Hagen v. Celotex Corp.*, 816 S.W.2d 667 (Mo. banc 1991), our Supreme Court held that only one of the plaintiffs' experts expressed a competent opinion as to the relationship between asbestos products and the decedent's death. *Id.* at 670. This witness, a treating internist, testified to a reasonable degree of medical certainty that dust from products containing asbestos directly caused or directly contributed to cause the decedent's cancer and death. *Id.* At trial, plaintiffs also offered the testimony of a Dr. Daugherty, an expert chemist and toxicologist. The trial court prohibited Dr. Daugherty from giving an opinion about the cause of the decedent's cancer or death because Dr. Daugherty was not a medical doctor. *Id.* at 675. Our Supreme Court affirmed that ruling, noting that "the testimony of the chemist-toxicologist, Dr. Daugherty, was not received as evidence of the cause of death and is not competent for that purpose." *Id.* at 670 n. 6. Point IV is denied.

---

5. In any event, Plaintiffs' motion sought to strike all of Dr. Simmons' testimony. The portion of his testimony concerning Dr. Schisler's compliance with the standard of care is not challenged on appeal and was admissible. Because Plaintiffs' motion to strike encompassed clearly admissible evidence, the trial court did not err in denying the motion. *See State v. Gilpin*, 320 S.W.2d 498, 504 (Mo. 1959); *State v. Kleypas*, 602 S.W.2d 863, 870 (Mo.App.1980).

The judgment of the trial court is affirmed.

BARNEY and BURRELL, JJ., Concur.